## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED UROLOGY CENTERS, LLC,
a Delaware limited liability company,

      Plaintiff,

v.                            Civ. No. _____

OPTUMCARE NEW MEXICO, LLC f/k/a
DAVITA MEDICAL GROUP NEW MEXICO, LLC,
a Delaware limited liability company,

      Defendant.

### NOTICE OF REMOVAL

Defendant OptumCare New Mexico, LLC ("Optum"), pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, hereby removes this action from the District Court in and for Bernalillo County, New Mexico, where the action is now pending, to the United States District Court for the District of New Mexico.  The removal of this action is based upon the following:

1.      On or about December 3, 2020, Plaintiff filed its complaint in the Second Judicial District in and for Bernalillo County, New Mexico, entitled <u>United Urology Centers, LLC v. OptumCare New Mexico, LLC f/k/a DaVita Medical Group New Mexico, LLC</u>, Case No. D-202-CV-2020-06590 (hereinafter referred to as the "Circuit Court Action").  A true and correct copy of the complaint that was filed in the Circuit Court Action and received by Optum is attached hereto as **Exhibit A.**

2.      Pursuant to D.N.M.LR-Civ. 81.1(a), legible copies of the remaining records and proceedings from the Circuit Court Action (summons, court-annexed arbitration certificate, and request for production) are attached hereto as Composite **Exhibit B.**  No other process, pleadings or orders have been filed in the Circuit court action or served upon Optum.

3.     Optum was served with a copy of the Summons and the Complaint on December 7, 2020.  This constitutes Optum's first notice of the Complaint for purposes of removal of this litigation.

4.     Plaintiff is a Delaware limited liability company the members of which are two individuals who are residents of New York and Illinois as well as an LLC whose only shareholder is a Georgia corporation with its principal place of business in Texas. *See* December 29, 2020 Email from Henry M. Bohnhoff, Esq., counsel for Plaintiff regarding Plaintiff's citizenship, a copy of which is attached hereto as **Exhibit C.**  Based upon the information provided by counsel, and the agreement of counsel, Plaintiff is determined to be a citizen of Illinois, New York, Georgia and Texas for purposes of diversity jurisdiction.

5.     Optum is a Delaware limited liability company with the following corporate structure:

- OptumCare New Mexico, LLC – sole member: OptumCare Management, LLC
- OptumCare Management, LLC – sole member:  OptumCare Holdings, LLC
- OptumCare Holdings, LLC – sole member: Collaborative Care Holdings, LLC
- Collaborative Care Holdings, LLC – sole member: OptumHealth Holdings, LLC
- OptumHealth Holdings, LLC – sole member:  Optum, Inc. (State of Incorporation - Delaware/Principal Place of Business - Minnesota)

Therefore, Optum is a citizen of Delaware and Minnesota for purposes of diversity jurisdiction. *See* Declaration of Lisa Wilson Re Citizenship of Defendant in Support of Notice of Removal, attached hereto as **Exhibit D.**

6.     There is complete diversity of citizenship, as Plaintiff is a citizen of Illinois, New York, Georgia and Texas while Optum is a citizen of Delaware and Minnesota.

7.     Although Optum does not concede that Plaintiff's claims have any merit or that Plaintiff is entitled to any relief whatsoever, taken as a whole the amount in controversy exceeds $75,000.  In its Complaint for Breach of Sublease, Plaintiff is seeking "an award of all the rent

payments due under the entire term of the lease, in the amount of $477,054, plus taxes, expenses and other amounts that [Plaintiff] is required to pay under the Lease," which amount is also well in excess of the jurisdictional threshold amount. *See* Compl., at 8.

8.      Accordingly, this action is a civil action of which the United States District Courts have original jurisdiction pursuant to 28 U.S.C. § 1332(a).

9.      Additionally, Optum is not a resident of New Mexico, the state in which the Circuit court Action was brought.  28 U.S.C. 1332(b)(2).

10.     For the reasons stated above, this action is removable to this Court pursuant to the provisions of 28 U.S.C. § 1441.

11.     There are no other defendants to this action, and, as such, there is no need for any consent to this removal.

12.     This Notice of Removal is timely as it is filed within thirty (30) days after the date on which Optum first received notice of the Circuit Court Action.  See 28 U.S.C. § 1446(b).

13.     Optum will give written notice of the filing of this notice as required by 28 U.S.C. § 1446(d).

14.     A copy of this notice will be filed with the clerk of the Circuit Court in and for Bernalillo County, New Mexico, as required by 28 U.S.C. § 1446(d).

**WHEREFORE**, Defendant, OptumCare New Mexico, LLC, hereby removes this case to the United States District Court for the District of New Mexico.

Respectfully submitted,

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By:*/s/ Eric R. Burris*
        Eric. R. Burris
        201 Third Street NW, Suite 1800
        Albuquerque, NM  87102
        Telephone: (505) 244-0770

Facsimile:  (505) 244-9266
Email:  eburris@bhfs.com

and

James A. Bombulie, Esq.
Florida Bar No. 0025749
*(Seeking pro hac vice admission in NM)*
**AKERMAN LLP**
Three Brickell City Centre
98 Southeast Seventh Street
Suite 1100
Miami, FL  33131
Phone:  (305) 374-5600
Fax:  (305) 374-5095
Email:  james.bombulie@akerman.com
Secondary:  cary.gonzalez@akerman.com

*Attorneys for Defendant OptumCare New Mexico, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 5, 2021, I electronically filed a true and correct copy of the foregoing **NOTICE OF REMOVAL** with the Court pursuant to CM/ECF procedure for the District of New Mexico, which will send notification of such filing and cause the following parties to be served via electronic means, as more fully reflected on the Notice of Electronic Filing:

Henry M. Bohnhoff, Esq.
RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.
P.O. Box 1888
Albuquerque, NM 87103
hbohnhoff@rodey.com

*Attorneys for Plaintiff United Urology Centers, LLC*

*/s/ Eric R. Burris*
Eric R. Burris

22038969.2

**FILED**
**2ND JUDICIAL DISTRICT COURT**
**Bernalillo County**
**12/3/2020 11:34 AM**
**CLERK OF THE COURT**
**Luke Tessman**

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT

United Urology Centers, LLC,
a Delaware limited liability company,
Plaintiff,

vs.                                    Case No.   D-202-CV-2020-06590

OptumCare New Mexico, LLC,
f/k/a DaVita Medical Group New Mexico, LLC,
a Delaware limited liability company,
Defendant.

## COMPLAINT FOR BREACH OF SUBLEASE

For its Complaint, Plaintiff United Urology Centers, LLC ("United"), alleges as follows:

### General Allegations

1.      United is a limited liability company organized under the laws of the state of Delaware.  United is registered to transact business in the State of New Mexico.

2.      Defendant OptumCare New Mexico, LLC, f/k/a DaVita Medical Group New Mexico, LLC ("DaVita"), is a limited liability company organized under the laws of the state of Delaware.  DaVita changed its name to OptumCare New Mexico, LLC, on or about October 11, 2019.  DaVita is registered to transact business in, and has a registered agent for service of process located in, the State of New Mexico.

3.      United has leased improved property, for use as an outpatient surgery center, located at 1720 Wyoming Blvd. NE, Albuquerque, Bernalillo County, New Mexico ("the Premises").   On and effective May 14, 2019, and pursuant to the Sublease Agreement ("Sublease") attached hereto as Exhibit 1 and incorporated herewith, DaVita subleased the Premises from United for a term ending on January 31, 2022.  United delivered possession of the

*Notice of Removal*
**Exhibit A**

Premises to DaVita, and DaVita took possession of same, on or about May 14, 2019; at the time

of delivery of possession, the Premises were in good working order.

4.      United brings this civil action to enforce the Sublease.  This Court has jurisdiction

over the subject matter of this action, and personal jurisdiction over DaVita.  This judicial district

is the proper venue for this action.

5.      Pursuant to Section 3(a) of the Sublease, DaVita has agreed to make monthly rent

payments to United as follows:

> Beginning on the [sic] October 1, 2019 (the "Rent Commencement Date")
> … and with condition that Subtenant has obtained all licenses, permits,
> accreditations from all applicable government authorities to be licensed and to
> operate as an ambulatory/outpatient surgical center (the "Licenses") no later than
> July 1, 2019, Subtenant shall pay as initial monthly rent for the exclusive use of
> the Subleased Premises the amount of $15,000.00 ("Base Rent").  In addition to
> the Base Rent, Subtenant shall be obligated to pay all taxes, expenses and other
> amounts that the Lease requires Sublandlord to pay, including a payment of an
> additional $2,000 per month commencing February 1, 2020 through the remainder
> of the Term. *Subtenant shall diligently pursue obtaining the Licenses. If, by no
> fault of Subtenant, Subtenant is unable to obtain the Licenses by June 25, 2019,
> then Subtenant may terminate this Sublease by providing Sublandlord written
> notice of the same (such notice, an "Early Termination Notice").* Such
> termination shall be effective five (5) calendar days following such notice and
> thereafter neither party shall have any further rights or remedies under the
> Sublease and both parties shall be relieved of any further obligations under the
> Sublease after the date of such termination, except those that expressly survive, or
> by their nature survive, such termination. *In the event that approval of
> Subtenant's Licenses are conditioned upon Subtenant performing some acts or
> series of acts, then Subtenant shall be obligated to make diligent efforts to
> perform such acts prior to Subtenant's terminating this Sublease pursuant to this
> paragraph 3(a).* If Subtenant does not provide an Early Termination Notice to
> Sublandlord on or before July 15, 2019, then (i) Subtenant's termination right
> under this paragraph 3(a) shall be extinguished and no longer apply, and (ii) the
> condition in the first sentence of this paragraph 3(a) regarding the Licenses shall
> be deemed to have been satisfied for all purposes of this Sublease.

(Emphasis added.)  Thus, under Section 3(a), DaVita had the right to terminate the Sublease if it

was unable to obtain, by June 25, 2019, "the Licenses" as that term is defined therein, but only if

2

DaVita had "diligently pursue[d] obtaining the Licenses" and the inability to obtain the Licenses was not the result of DaVita's "fault."

6.      Pursuant to Section 3(a) of the Sublease, DaVita is obligated to make monthly rent payments to United in the amount of $15,000, plus all taxes, expenses and other amounts that United is obligated under its lease to pay to its landlord, beginning on October 1, 2019. DaVita is obligated to pay United an additional $2,000 per month beginning February 1, 2020. In addition, pursuant to Section 3(b) of the Sublease, DaVita's monthly base rent obligation increases 3% on every anniversary of the Rent Commencement Date.

7.      Pursuant to Section 13 and Exhibit E of the Sublease, DaVita is obligated to maintain the Premises, including but not limited to electrical wiring, in good condition, and as and when necessary repair the Premises to that standard.

8.      On or about May 23, 2019, after DaVita had taken possession of the Premises, the Premises were burglarized and vandalized.   Among other damage, the burglar(s)/vandal(s) stripped and stole electrical wiring throughout the building ("Vandalism Damage").

9.      Under the Sublease, DaVita is obligated to repair the Vandalism Damage, and has acknowledged its responsibility to pay for the cost of those repairs.   United has undertaken to repair the Vandalism Damage.   DaVita has reimbursed United for a portion of the cost of the repairs but has refused to make reimbursement for the entire cost of the repairs.

10.     Following the vandalism and burglary incident, and as late as June 6, 2019, DaVita confirmed its intention to repair the Vandalism Damage and make tenant improvements to the Premises, with a "target clinic opening of early September."   However, on June 25, 2019, DaVita notified United that it was exercising what it claimed was its right under Section 3(a) quoted above to elect early termination of the Sublease.

3

11.   DaVita initially asserted that it was entitled to elect early termination of the Sublease on the grounds that, "Due to the theft and vandalism at the Building [the Premises], Subtenant is unable to obtain the licenses, permits, and accreditations from the applicable authorities, to be licensed and operate as an ambulatory/outpatient surgical center by June 25, 2019." *See* June 25, 2019, A. Nelson letter to HealthTronics, Inc., Legal Department, attached hereto as Exhibit 2 and incorporated herewith.

12.   Subsequently, however, DaVita provided an entirely different and inconsistent justification for its early termination election. Citing "code compliance issues," DaVita now claims that, "irrespective of the Theft, Subtenant's rights to terminate the Sublease was in full force and effect because Subtenant was unable to obtain the Licenses by June 25, 2019 as a result of a whole host of additional issues that were completely unrelated to the Theft." *See* August 2, 2019, A. Nelson letter to H. Bohnhoff, attached hereto as Exhibit 3 and incorporated herewith.

13.   Upon information and belief, DaVita's decision to assert a right to elect early termination of the Sublease was motivated not by any inability to obtain the Licenses, but rather by its completion on June 19, 2019, of a merger with OptumCare and a decision by DaVita and Optum that they no longer wished to open an outpatient surgery center on the Premises.

14.   DaVita abandoned the Premises on or about June 25, 2019.

15.   Since June 25, 2019, DaVita has maintained that it terminated the Sublease on June 25, 2019. Further, since October 1, 2019, DaVita has not made the rent payments due to United in accordance with Sublease Section 3(a). DaVita's non-payment of its rents constitutes an event of default pursuant to Section 10(a) of the Sublease.

16.   United has rejected, and refused to accept, DaVita's attempted termination of the Sublease.

4

17.     Section 10(b) of the Sublease authorizes United, in the event of non-payment of rent by DaVita, to bring suit to collect the past due rent while reserving its right to collect remaining rent payments when they become due.

18.     Pursuant to Sublease Section 1(a), the Sublease incorporates, with specified exceptions, the provisions of United's underlying January 27, 2017, lease ("the Lease") with the landlord of the Premises.  Section 17 of the Lease provides that, in any action brought for any sum due under the Sublease, or because of any act which may arise out of the possession of the Premises, the prevailing party shall be entitled to recover from the other party its costs and reasonable attorney's fees.

Count I – Damages for Breach of Sublease by Failure to Make Repairs

19.     United realleges and incorporates herein by reference the allegations of Paragraphs 1 through 18 above.

20.     Under the Sublease, DaVita has a duty to repair the Vandalism Damage.

21.     DaVita has defaulted and breached the Sublease by failing to pay for the entire cost of repairing the Vandalism Damage.

22.     United has been damaged by DaVita's breach of the Sublease.

23.     DaVita's breach of the Sublease has been malicious, reckless, wanton and/or fraudulent.

Count II – Declaratory Judgment

24.     United realleges and incorporates herein by reference the allegations of Paragraphs 1 through 18 above.

25.     An actual controversy exists between United and DaVita regarding the lawfulness of DaVita's June 25, 2019, early termination notice.

5

26.     Pursuant to the Declaratory Judgment Act, NMSA 1978, §§ 44-6-1 et seq., United is entitled to a declaratory judgment that DaVita's claimed exercise of the Section 3(a) early termination right is unlawful, because (1) it did not diligently pursue obtaining "the Licenses," as that term is defined in Section 3(a), and (2) its inability to obtain the Licenses was the result of DaVita's fault.

27.     United is entitled to a further declaratory judgment that DaVita's early termination notice was invalid and it remains obligated to make monthly rent payments for the entire term of the Sublease.

Count III – Damages for Breach of Sublease by Nonpayment of Rent to Date

28.     United realleges and incorporates herein by reference the allegations of Paragraphs 1 through 18 above.

29.     DaVita has breached the Sublease by failing to make its monthly rent payments as required by the Sublease, beginning on October 1, 2019.

30.     United has been damaged by DaVita's breach of the Sublease.

31.     DaVita's breach of the Sublease was malicious, reckless, wanton and/or fraudulent.

Count IV– Damages for Breach of Sublease by Anticipatory Repudiation and Abandonment

32.     United realleges and incorporates herein by reference the allegations of Paragraphs 1 through 31 above.

33.     DaVita has repudiated the Sublease by notifying United on June 25, 2019, that it was exercising its right under Section 3(a) to elect early termination of the Sublease, and by abandoning the Premises on or about the same date.

6

34.     DaVita's claimed exercise of the Section 3(a) early termination right was unlawful, because (1) it did not diligently pursue obtaining "the Licenses," as that term is defined in Section 3(a), and (2) its inability to obtain the Licenses was the result of DaVita's fault.

35.     DaVita's abandonment of the Premises and repudiation of the Sublease constitutes a breach of the Sublease.

36.     United has been damaged by DaVita's breach of the Sublease.

37.     DaVita's breach of  the Sublease by repudiating it, failing to repair the Premises, abandoning the Premises, and failing to make rent payments entitles United to accelerate the lease payments, with all of the payments for the entire term of the Sublease being now due and owing.

38.     DaVita's anticipatory repudiation and breach of the Sublease was malicious, reckless, wanton and/or fraudulent.

Requested Relief

United is entitled to judgment again DaVita as follows:

A.     An award of compensatory damages in the amount of the cost of repairing the Vandalism Damage, including the cost of supervising and inspecting the repair work.

B     A declaration that DaVita's claimed exercise of its right to elect early termination of the Sublease on June 25, 2019, was wrongful, and that DaVita has a continuing obligation to make monthly rent payments.

C.     An award of compensatory damages in the amount of the unpaid rent accruing under the Sublease as of the date of judgment.

7

D.      In the alternative, an award of all of the rent payments due under the entire term of the lease, in the amount of $477,054, plus taxes, expenses and other amounts that United is required to pay under the Lease.

E.      An award of punitive damages in an amount to be determined at trial.

F.      An award of pre- and post-judgment interest.

G.      An award of United's costs and reasonable attorney's fees incurred enforcing the Sublease against DaVita.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: _____*/s/ Henry M. Bohnhoff*_____
          Henry M. Bohnhoff
P.O. Box 1888
Albuquerque, NM 87103
Telephone:  (505) 765-5900
hbohnhoff@rodey.com

*Attorneys for Plaintiff United Urology Centers, LLC*

8

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

**SUBLEASE AGREEMENT**

**BY AND BETWEEN**

**UNITED UROLOGY CENTERS, LLC**

**("SUBLANDLORD")**

**AND**

**DAVITA MEDICAL GROUP NEW MEXICO, LLC**

**("SUBTENANT")**

**FOR SPACE AT**

**1720 WYOMING NE, ALBUQUERQUE, NM 87112**

**Dated: _____,   2019**

**Exhibit 1**

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Incorporation of Lease. | 1 |
| 2. | Term. | 3 |
| 3. | Rent. | 3 |
| 4. | Delivery and Condition of Subleased Premises. | 4 |
| 5. | Use of Subleased Premises. | 4 |
| 6. | Improvements and Alterations. | 5 |
| 7. | Improvement Allowance. | 5 |
| 8. | Assignment/Subletting. | 5 |
| 9. | Indemnity. | 6 |
| 10. | Default and Remedies. | 6 |
| 11. | Insurance. | 8 |
| 12. | Subrogation. | 9 |
| 13. | Repairs and Maintenance. | 9 |
| 14. | Compliance with Laws. | 9 |
| 15. | Environmental. | 9 |
| 16. | Quiet Enjoyment. | 11 |
| 17. | Parking. | 11 |
| 18. | Subtenant's Satellite and Cable Rights. | 11 |
| 19. | Signage. | 11 |
| 20. | Notices. | 11 |
| 21. | Sublandlord's Sale of the Building. | 12 |
| 22. | Regulatory Compliance. | 12 |
| 23. | Surrender of Subleased Premises. | 13 |
| 24. | Holding Over. | 13 |
| 25. | Brokerage Fee. | 14 |
| 26. | Binding Effect. | 14 |
| 27. | Severability. | 14 |
| 28. | Applicable Law. | 14 |
| 29. | Complete Agreement. | 14 |
| 30. | Counterparts. | 14 |
| 31. | Waiver. | 14 |

Albuquerque, NM (1720 Wyoming NE) (United Urology Centers LLC)
48196323;11

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

32.   Incorporation of Recitals, Exhibits, and Data Sheet........................................... 15

33.   Landlord's Consent............................................................................................. 15

Albuquerque, NM (1720 Wyoming NE) (United Urology Centers LLC)
48196323;11

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

**EXHIBITS**

EXHIBIT A   SUBLEASED PREMISES FLOOR PLAN

EXHIBIT B   LEASE

EXHIBIT C   LEGAL DESCRIPTION

EXHIBIT D   COMMENCEMENT DATE MEMORANDUM

EXHIBIT E   MAINTENANCE OBLIGATIONS

EXHIBIT F   PARKING SITE PLAN

Albuquerque, NM (1720 Wyoming NE) (United Urology Centers LLC)
48196323;11

## DATA SHEET

| | |
|---|---|
| Sublandlord: | United Urology Centers, LLC, a Delaware limited liability company |
| Address of Sublandlord: | c/o HealthTronics, Inc.<br>9825 Spectrum Drive, Building 3<br>Austin, Texas 78717<br>Attn: Legal Department |
| Address for Payment of Rent: | By regular mail: |

HealthTronics Group LP
PO Box 95333
Grapevine, TX 76099-9732

Or via overnight mail to:
HealthTronics Group LP
Attn: Remittance Processing - (Lockbox 95333)
3330 W Royal LN
Irving, TX 75063-6013

| | |
|---|---|
| Subtenant: | DaVita Medical Group New Mexico, LLC, a Delaware limited liability company |
| Address of Subtenant: | c/o DaVita Inc.<br>2000 16th Street<br>Denver, CO 80202<br>Attn: Real Estate Legal<br>relegal@davita.com |
| If related to Rent,<br>a copy to: | c/o DaVita Medical Group<br>P.O. Box 1476<br>Tacoma, WA 98401-1476<br>Attention: Rent Department<br>With a concurrent copy to:<br>DMGRentDepartment@davita.com |
| Subleased Premises Address: | 1720 Wyoming NE, Albuquerque, NM 87112 |
| Subleased Premises Area: | approximately 14,190 rentable square feet |

iv

Rent:

| **Sublease Term:** | **Rent PSF** | **Base Rent** | **Additional Payment\*** | **Total Monthly Rent** | **Total Annual Rent** |
| --- | --- | --- | --- | --- | --- |
| October 1, 2019 through January 31, 2020: | $12.68 | $15,000.00 | $0.00 | $15,000.00 | $180,000.00 |
| February 1, 2020 through September 30, 2020 | $14.38 | $15,000.00 | $2,000.00 | $17,000.00 | $204,000.00 |
| October 1, 2020 through September 30, 2021: | $14.76 | $15,450.00 | $2,000.00 | $17,450.00 | $209,400.00 |
| October 1, 2021 through January 31, 2022: | $15.15 | $15,913.50 | $2,000.00 | $17,913.50 | $190,962.00 |

\*The chart above includes, under the column labeled "Additional Payment", the amounts due by Tenant pursuant to Section 2(c) of the Lease.

v

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

## SUBLEASE AGREEMENT

**THIS SUBLEASE AGREEMENT** (this "Sublease") is made as of (the "Effective Date") the later of (i) last day of execution of this Sublease by both parties hereto, and (ii) the date Landlord's (as defined below) consent is obtained, by and between UNITED UROLOGY CENTERS, LLC, a Delaware limited liability company ("Sublandlord") and DAVITA MEDICAL GROUP NEW MEXICO, LLC, a Delaware limited liability company ("Subtenant").

### R E C I T A L S:

**WHEREAS**, pursuant to that certain Lease Agreement by and between Sublandlord and J. Edwin Eng, as trustee of the J. Edwin Eng Living Trust u/t/d February 9, 1995 and Charles L. Hostetter, as trustee of the Charles L. Hostetter Living Trust u/t/d February 9, 1995, jointly as successor in interest to MV Industries Real Estate, LLC ("Landlord") dated as of January 27, 2017, as amended by that certain First Amendment to Lease Agreement dated April 30, 2019 attached hereto as Exhibit B (the "Lease"), Sublandlord leases from Landlord certain space having an address of 1720 Wyoming NE, Albuquerque, NM 87112 (the "Premises") located within a building (the "Building") situated on the real property as legally described on Exhibit C. The term "Lease" or "Lease" when used herein shall also include any and all amendments and modifications to the Lease now or hereafter existing.

**WHEREAS**, Sublandlord desires to sublease Subtenant, and Subtenant desires to sublease from Sublandlord, together with a non-exclusive right to use all improvements thereon and appurtenant rights thereto, the Premises consisting of approximately 14,190 rentable square feet as more fully depicted on the floor plan attached as Exhibit A (the "Subleased Premises"); and

**NOW, THEREFORE**, for and in consideration of the mutual covenants, promises and agreements herein contained, Sublandlord does hereby demise, lease and rent unto Subtenant and Subtenant does hereby rent and lease from Sublandlord the Subleased Premises, under and pursuant to the following terms and conditions:

1.      Incorporation of Lease.

(a)     A copy of the Lease has been delivered to Subtenant and Subtenant acknowledges that it has read the Lease and is fully familiar with all terms and conditions of the Lease. All of the terms, covenants, conditions and provisions of the Lease including, without limitations, all Exhibits thereto, are hereby incorporated in and made part of this Sublease except the following which are specifically excluded: (i) the provisions and obligations set forth in paragraph 2(a), Rental, of the Lease; (ii) the provisions and obligations set forth in paragraph 2(d), Tenant Improvement, of the Lease; (iii) the provisions and obligations set forth in paragraph 4, Security Deposit, of the Lease; (iv) the requirement to deliver insurance certificates in paragraph 13.5, Certificates; (v) the provisions and obligations set forth in paragraph 21, Option to Renew, of the Lease; (vi) the provisions and obligations set forth in paragraph 22, Grant of Right of First Refusal

1

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

and Purchase Option, and (vii) the provisions and obligations set forth in paragraph 23, Expiration of Right of First Refusal, of the Lease. All duties, obligations, liabilities and responsibilities of Sublandlord, as "Tenant" under the Lease in respect of the Subleased Premises, shall be, as applicable, the duties, obligations, liabilities and responsibilities of Subtenant hereunder to Sublandlord and Landlord, with such obligations, liabilities and responsibilities as it relates to the maintenance and repair of the Subleased Premises more specifically set forth in Exhibit E. Sublandlord may exercise all of the rights, powers, privileges and remedies reserved to Landlord under the Lease with respect to the Subleased Premises to the same extent as if set forth herein, including, without limitation, all releases from liability to Landlord under the Lease and all rights and remedies, including, without limitation, the right to charge a fee and/or interest, arising out of or with respect to any failure of Subtenant to timely pay Rent or to observe or perform the terms, covenants, conditions and agreements of this Sublease and the Lease or the rights and remedies for Subtenant's holdover in the Subleased Premises following the termination (except as specifically provided in this Sublease). Notwithstanding the foregoing, any inconsistencies between the terms of this Sublease and those of the Lease which shall result from the foregoing incorporation shall be resolved in favor of this Sublease, provided, however, that if such resolution would cause Sublandlord to be in default under the terms of the Lease, then any inconsistency shall be resolved so as not to cause Sublandlord to be in default under the terms of the Lease. Sublandlord, by reason of the foregoing or any other provision of this Sublease, shall not be deemed to have assumed and shall not be obligated to perform any duty or obligation of Landlord under the Lease. Any default of Sublandlord under the Lease shall constitute a default of Sublandlord under the Sublease.

(b) Notwithstanding anything in this Sublease to the contrary, Subtenant expressly acknowledges and agrees that Sublandlord shall not have any liability or responsibility of any kind or nature whatsoever for any act or omission of Landlord, or for any failure by Landlord to perform and comply with its duties, obligations, liabilities and responsibilities under the Lease; and, without limiting the generality of the foregoing, Sublandlord shall not be obligated to furnish for Subtenant any services of any nature whatsoever, including, without limitation, the furnishing of heat, electrical energy, air conditioning, cleaning, window washing, or rubbish removal services, provided, nevertheless, that in the event of any such default or failure of performance by Landlord, Sublandlord agrees, upon notice from Subtenant, to make demand upon Landlord to perform its obligations under the Lease and exercise reasonable legal remedies to enforce the Lease.

(c) Subtenant covenants and agrees that Subtenant will not do anything that would constitute a default under the Lease or omit to do anything which Subtenant is obligated to do under the terms of this Sublease and which would constitute a default under the Lease.

(d) In addition to, and not in lieu of other remedies provided in this Sublease, Sublandlord may, but shall not be required to, make any payment or do any act Subtenant has failed to do in order to cure or prevent any default by "Tenant" under the Lease or

2

Subtenant under this Sublease and the amount of the expense thereof shall be due and payable from Subtenant to Sublandlord upon receipt of a written statement of such expenses from Sublandlord. Subject and subordinate to the terms, conditions and provisions of the Lease and this Sublease, Sublandlord hereby subleases to Subtenant, and Subtenant hereby subleases from Sublandlord, the Subleased Premises, in its "as is" condition existing on the date possession is delivered to Subtenant, without requiring any alterations, improvements, repairs or decorations to be made by Sublandlord or at Sublandlord's expense. Subtenant represents that it has thoroughly examined the Building and the Subleased Premises. The parties agree and acknowledge that the Subleased Premises contain Sublandlord's basic furnishing and fixings which Subtenant may utilize.

2.     Term. The term (the "Term") of this Sublease shall commence on the Effective Date (the "Commencement Date") and shall expire at 10:59 p.m. on January 31, 2022, or as sooner terminated in accordance with the provisions hereof (the "Termination Date"). Upon determination of the Commencement Date, Sublandlord shall complete, execute and forward a Commencement Date Memorandum in the form attached as Exhibit D to Subtenant for Subtenant's approval and execution.

3.     Rent.

       (a)     Rent. Beginning on the October 1, 2019 (the "Rent Commencement Date") and subject to Sublandlord providing Subtenant a completed Form W-9 Request for Taxpayer Information and Certification and with condition that Subtenant has obtained all licenses, permits, accreditations from all applicable government authorities to be licensed and to operate as an ambulatory/outpatient surgical center (the "Licenses") no later than July 1, 2019, Subtenant shall pay as initial monthly rent for the exclusive use of the Subleased Premises the amount of $15,000.00 ("Base Rent"). In addition to the Base Rent, Subtenant shall be obligated to pay all taxes, expenses and other amounts that the Lease requires Sublandlord to pay, including a payment of an additional $2,000 per month commencing February 1, 2020 through the remainder of the Term. Subtenant shall diligently pursue obtaining the Licenses. If, by no fault of Subtenant, Subtenant is unable to obtain the Licenses by June 25, 2019, then Subtenant may terminate this Sublease by providing Sublandlord written notice of the same (such notice, an "Early Termination Notice"). Such termination shall be effective five (5) calendar days following such notice and thereafter neither party shall have any further rights or remedies under the Sublease and both parties shall be relieved of any further obligations under the Sublease after the date of such termination, except those that expressly survive, or by their nature survive, such termination. In the event that approval of Subtenant's Licenses are conditioned upon Subtenant performing some acts or series of acts, then Subtenant shall be obligated to make diligent efforts to perform such acts prior to Subtenant's terminating this Sublease pursuant to this paragraph 3(a). If Subtenant does not provide an Early Termination Notice to Sublandlord on or before July 15, 2019, then (i) Subtenant's termination right under this paragraph 3(a) shall be extinguished and no longer apply, and (ii) the condition in the first sentence of this paragraph 3(a) regarding the Licenses shall be deemed to have been satisfied for all purposes of this Sublease.

3

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

(b)     Rent Adjustments.      On the first annual anniversary of the Rent Commencement Date and each subsequent annual anniversary thereafter during the Term the Base Rent shall be increased by 3% annually over the Base Rent for the prior Sublease Year (as defined below).      Each 12 month period beginning on the Commencement Date or any anniversary thereof shall be referred to in this Sublease as a "Sublease Year".

(c)     Payment of Rent.  Rent shall be payable on or before the fifth calendar day of each month during the term of this Sublease.  Monthly installments of Rent shall be prorated for any partial calendar month in which the Commencement Date or Expiration Date may occur.

(d)     Place of Payment.  Subtenant shall send all Base Rent and other amounts due hereunder to Sublandlord at the address shown on the Data Sheet hereinabove or to such other place as Sublandlord may designate from time to time by written notice to Subtenant.

(e)     All Sums Due.  All sums due to Sublandlord from Subtenant shall constitute "Rent" under this Sublease and will be subject to all the terms and conditions for payment as set forth in this Sublease.

4.     Delivery and Condition of Subleased Premises.  Sublandlord shall deliver possession of the Subleased Premises to Subtenant within 5 (five) calendar days following full execution of this Sublease, including Landlord's consent (the "Possession Date").  If Sublandlord fails to deliver the Subleased Premises to Subtenant within 90 days of the full execution of this Sublease, Subtenant may elect to (a) terminate the Sublease by written notice to Sublandlord effective immediately, or b) elect to receive two days of rent abatement for every day of delay beyond the 90-day delivery period. Subtenant has inspected the Subleased Premises, is satisfied with their condition and hereby accepts the Subleased Premises in their "AS IS" condition.  Sublandlord shall deliver the Building and main utility lines serving the Building in good working order and shape.

5.     Use of Subleased Premises.  Subtenant shall be entitled to the exclusive use of the Subleased Premises.  The Subleased Premises shall be used by Subtenant for the operation of an outpatient primary care clinic and similar blood separation and cell collection procedures, general medical offices, clinical laboratory, including all incidental, related, and necessary elements and functions of other primary care disciplines which may be necessary or desirable to render a complete program of treatment to patients of Subtenant and for related office and administrative uses or for any other lawful purposes (the "Permitted Use").  Subtenant may operate during such days and hours as Subtenant may determine, without the imposition of minimum or maximum hours of operation by Landlord or Sublandlord, and Subtenant will have exclusive use of and full-time access to the Subleased Premises, and may operate, up to 24 hours per day, seven days per week, year-round.

4

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

6.     Improvements and Alterations. Subtenant shall construct its subtenant improvements to the property (the "Subtenant Improvements"). Subtenant shall contract for the Subtenant Improvements with a contractor of Subtenant's choice, with the Sublandlord's approval which said approval shall to be unreasonably withheld, conditioned or delayed. Contractors shall be bonded, insured, and licensed in the state of New Mexico. Subtenant shall have the right to make interior non-structural alterations, additions and improvements to the Subleased Premises ("Alterations") that it shall deem desirable for the operation of its business, without Landlord or Sublandlord's consent, provided that any such Alterations shall not diminish the value of the Subleased Premises nor impair the structural integrity of the Subleased Premises or the Building.     All Alterations shall be made in compliance with applicable governmental codes. All other alterations shall require Landlord and Sublandlord's prior written consent, such consent not to be unreasonably withheld, conditioned or delayed.

7.     Improvement Allowance. Sublandlord shall provide Subtenant with a Subtenant Improvement allowance in the amount of $6.63 per square foot for a total of $94,079.70 (the "Improvement Allowance").     Upon Sublandlord's receipt of Subtenant's written certification that all of the Licenses have been obtained as well as a certificate of occupancy sufficient for Subtenant to operate in the Subleased Premises, the Improvement Allowance shall be paid in a lump sum or in monthly draws to Subtenant, or to Subtenant's contractor at Subtenant's direction.     If paid in monthly draws, Sublandlord shall pay each monthly draw within ten days of receipt of Subtenant's request, which request will include an invoice or other evidence setting forth the amount to be paid. If paid in a lump sum, such amount shall be paid within ten days after Subtenant delivers to Sublandlord Subtenant's written certification that all of the Licenses have been obtained as well as a certificate of occupancy sufficient for Subtenant to operate in the Subleased Premises. Such sum shall reimburse Subtenant for the cost of Subtenant's leasehold improvements, with any residual amount to be reimbursement for the purchase of Subtenant's fixtures and furniture. Any payments to Subtenant or Subtenant's contractors are expressly conditioned on the submission of lien waivers, in a from approved by the Landlord and Sublandlord executed by all persons performing the improvements. In, the event Sublandlord does not pay any amount within the timeframes stated herein, Sublandlord shall be in default of this Sublease and interest shall immediately begin to accrue at an annual rate of twelve percent per annum. Furthermore, in addition to all rights and remedies available to Subtenant in the event of Sublandlord's default, including, but not limited to the commencement of any and all necessary legal action, Subtenant shall have the right to abate Rent and all other charges until the amount due Subtenant, plus interest, has been fully recovered or has been paid in full by Sublandlord. Any unused portion of the Improvement Allowance shall be credited as rent abatement.

8.     Assignment/Subletting.

      (a)     Except for a Permitted Transfer (as defined below), subject to Landlord's execution of the Landlord Consent, Subtenant shall not assign this Sublease, or sublet the Subleased Premises, or any part thereof, without Landlord and Sublandlord's prior

5

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Prior to any sublease or assignment, other than a Permitted Transfer, Subtenant shall notify Landlord and Sublandlord in writing of its election to sublease all or a portion of the Subleased Premises or to assign this Sublease or any interest hereunder. Such notice shall be accompanied by financial information, including financial statements, and information concerning the proposed assignee's or sublessee's prior experience in operating a primary care facility as reasonably required by Sublandlord and Landlord.

(b) Notwithstanding the foregoing, subject to Landlord's execution of the Landlord Consent, Landlord and Sublandlord's consent shall not be required to assign, sublet or otherwise transfer (by operation of Law or otherwise) this Sublease or any of its rights hereunder to: (i) any person, corporation, partnership or other entity which acquires all or substantially all of the business or assets of Subtenant or equity in Subtenant; (ii) any persons, corporation, or partnership or other entity which controls, is controlled by or is under common control with Subtenant; (iii) any affiliate (within the meaning of such term as set forth in Rule 501 of Regulation D under the Federal Securities Act of 1933, as amended) of Subtenant; or (iv) as to a subtenant only, with respect to less than twenty-five percent (25%) of the Subleased Premises, any physician or other entity providing services in the Subleased Premises, for purposes consistent with the Permitted Use (each a "Permitted Transfer").

(c) No assignment, sublease or other transfer, in whole or in part, of any Subtenant's rights or obligations under this Sublease shall release Subtenant hereunder, and Subtenant shall remain responsible for performing Subtenant's obligations hereunder should Subtenant's assignee, subtenant or transferee fail to perform any such obligations, unless specifically provided otherwise by Sublandlord in writing. Except with respect to a Permitted Transfer of more than 25% of the Subleased Premises, Sublandlord shall be entitled to fifty percent (50%) of the profits in connection with such sublease or assignment.

9. Indemnity. Subtenant agrees to indemnify Sublandlord and save Sublandlord harmless from any and all liability, claims and loss for personal injury or property damage, or both, sustained or claimed to have been sustained by any person or persons, or property in, upon or about the Subleased Premises or Building caused or brought about by the act or neglect of Subtenant or its agents, servants or employees. Sublandlord agrees to indemnify Subtenant and save Subtenant harmless from any and all liability, claims and loss for personal injury or property damage, or both, sustained or claimed to have been sustained by any person or persons, or property in, upon or about the Subleased Premises, the Building or the land on which the Building is located caused or brought about by the act or neglect of Sublandlord or its agents, servants or employees.

10. Default and Remedies.

(a) Subtenant Default. A "Subtenant Default" shall have deemed to occur in the event that (i) Subtenant defaults in the payment of Rent hereunder and such Rent or remains due and unpaid for ten days following written notice of such default from

6

Albuquerque, NM (1720 Wyoming NE) (United Urology Centers LLC)
48196323;11

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

Sublandlord to Subtenant; (ii) Subtenant defaults in the performance of any other provisions of this Sublease and such default is not cured within 30 days following written notice from Sublandlord specifying such default (unless such default is not reasonably capable of being cured within such 30 day period and Subtenant is diligently prosecuting such cure to completion); (iii) a petition in bankruptcy is filed by or against Subtenant and is not dismissed, withdrawn or stayed within 90 days; or (iv) Subtenant makes an assignment for the benefit of its creditors, or a receiver is appointed for Subtenant and such receiver is not dismissed within 60 days of its appointment (each a "Subtenant Default").

(b)    Sublandlord Remedies.  In the event of a Subtenant Default, Sublandlord, at its option, may (a) proceed for past due installments of Rent while reserving its right to proceed to collect the remaining installments when the same become due; or (b) for a material Subtenant Default declare the rights of Subtenant under this Sublease terminated and, thereafter, recover possession of the Subleased Premises through legal process.    Sublandlord shall make commercially reasonable efforts to mitigate any damages Sublandlord incurs as a result of Subtenant's breach of this Sublease. If the consideration collected by Sublandlord upon reletting the Subleased Premises pursuant to this Section is not sufficient to pay the full monthly amount of Rent and Rent provided for in this Sublease to be paid by Subtenant, Subtenant shall pay to Sublandlord the amount of each monthly deficiency upon demand.  Whether or not this Sublease is terminated by Sublandlord or by any provision of Law, Subtenant has no obligation to pay any Rent until the date it would otherwise have become due in the absence of any event of default. Absent any default of this Sublease by Subtenant, subject to applicable notice and cure periods, Sublandlord agrees that it shall have no right to accelerate (i.e. declare the same immediately due and payable) any Rent which would have become due in the future. Upon termination of this Sublease by Sublandlord due to a Subtenant Default, Subtenant shall pay Sublandlord for the then unamortized out-of-pocket costs of leasing commissions and a subtenant allowance (if any).



(c)    Sublandlord Default and Subtenant Remedies.  Subject to the terms and provisions below, and in addition to any other remedy expressly available to Subtenant pursuant to this Sublease or at law or in equity, should Sublandlord fail to perform any term or covenant under this Sublease (each and any such failure, a "Sublandlord Default") and if any such Sublandlord Default is not cured and continues for 30 days (unless a shorter notice and cure period is expressly provided herein, in which case such shorter period shall govern) following written notice by Subtenant to Sublandlord of such Sublandlord Default (unless such default is not reasonably capable of being cured within such expressed period and Sublandlord is diligently prosecuting such cure to completion), then Subtenant shall have the option, (at Subtenant's sole discretion), of (a) terminating this Sublease in the event of a material Sublandlord Default, (b) abating or withholding Rent, or (c) remedying such Sublandlord Default and, in connection therewith, incurring expenses for the account of Sublandlord, and any and all such sums expended or obligations incurred by Subtenant in connection therewith shall be paid by Sublandlord to Subtenant upon demand, and if Sublandlord fails to immediately reimburse and pay same to Subtenant, Subtenant may, in addition to any other right or remedy that Subtenant may

7

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

have under this Sublease, deduct such amount (together with interest thereon at the maximum rate permitted by applicable Law from the date of any such expenditure by Subtenant until the date of repayment thereof by Sublandlord to Subtenant) from subsequent installments of Rent that from time to time become due and payable by Subtenant to Sublandlord hereunder. In the event Sublandlord is unwilling or unable to take action which it is obligated to take hereunder, Subtenant may take such action as is reasonably necessary to protect the Subleased Premises and/or persons or property in the Subleased Premises (so long as Subtenant gives notice within a reasonable period of time thereafter). Sublandlord shall within 15 days of receipt of written notice from Subtenant reimburse Subtenant for its reasonable out-of-pocket expenses incurred in taking such action, and if Sublandlord shall fail to reimburse Subtenant, Subtenant may deduct such amount from subsequent installments of Rent as provided in the preceding sentence.

11.    Insurance.

(a)    Sublandlord's Insurance. During the Term, Sublandlord shall procure and maintain in full force and effect with respect to the Building and the land on which the Building is located (i) a policy or policies of property insurance (including, to the extent required, sprinkler leakage, vandalism and malicious mischief coverage, and any other endorsements required by the holder of any fee or leasehold mortgage and earthquake, terrorism and flood insurance to the extent Sublandlord reasonably deems prudent and/or to the extent required by any mortgagee) for full replacement value; and (ii) a policy of commercial liability insurance in a minimum amount of $1,000,000.00 per occurrence and $3,000,000.00 in the aggregate for both bodily injury and property damage insuring Sublandlord's activities with respect to the Subleased Premises and the Building for loss, damage or liability for personal injury or death of any person or loss or damage to property occurring in, upon or about the Subleased Premises or the Building.

(b)    Subtenant's Insurance. Subtenant shall obtain and keep in force with respect to the Subleased Premises and Subtenant's use thereof commercial general liability insurance in a minimum amount of $1,000,000.00 per occurrence and $3,000,000.00 in the aggregate for both bodily injury and property damage. In no event shall Subtenant's insurance provide coverage or indemnity to Sublandlord for any claim, loss, suit, action or other legal proceeding in which Sublandlord or its agents, servants, employees, guests, invitees, or independent contractors bear responsibility. Rather, it is the intent of this Section to provide general liability coverage to Sublandlord when it is made a party to a claim, loss, suit, action or other legal proceeding for which it bears no responsibility. In the event that both Sublandlord and Subtenant bear responsibility for the claim, loss, suit, action or other legal proceeding, then each party will look to its own insurance for coverage. Subtenant may carry any insurance required by this Sublease under a blanket policy or under a policy containing a self-insured retention.

(c)    Subtenant shall obtain and maintain all insurance types and coverages specified in the Lease to be obtained and maintained by Sublandlord, as "Tenant" under the Lease, and Subtenant shall also obtain and maintain waiver of subrogation

8

endorsements from its insurer. All policies of insurance obtained by Subtenant shall name Landlord and Sublandlord as additional insureds and/or loss payee thereon in accordance with the Lease, and all endorsements waiving the right of subrogation of Subtenant's insurers shall benefit Landlord and Sublandlord. Subtenant's insurance shall be primary over Landlord's and Sublandlord's insurance.

12.     Subrogation. Each of the parties hereto hereby releases the other and the other's partners, agents and employees, to the extent of each party's property insurance coverage, from any and all liability for any loss or damage which may be inflicted upon the property of such party even if such loss or damage shall be brought about by the fault or negligence of the other party or its partners, agents or employees; provided, however, that this release shall be effective only with respect to loss or damage occurring during such time as the appropriate policy of insurance shall contain a clause to the effect that this release shall not affect said policy or the right of the insured to recover thereunder. If any policy does not permit such a waiver, and if the party to benefit therefrom requests that such a waiver be obtained, the other party agrees to obtain an endorsement to its insurance policies permitting such waiver of subrogation if it is commercially available and if such policies do not provide therefor. If an additional premium is charged for such waiver, the party benefiting therefrom, if it desires to have the waiver, agrees to pay to the other the amount of such additional premium promptly upon being billed therefor.

13.     Repairs and Maintenance. The maintenance and repair obligations of Landlord under the Lease to the Premises shall remain the maintenance and repair obligations of Landlord. The maintenance and repair obligations of Sublandlord for the Subleased Premises under the Lease shall be the responsibility of Subtenant. Landlord's and Subtenant's maintenance and repair obligations are more specifically set forth on Exhibit E, attached hereto. Subtenant shall pay for all costs necessary to repair the roof related to the Subtenant causing or creating any roof penetrations.

14.     Compliance with Laws. Both parties shall comply with all applicable local, state, and federal laws, ordinances, statutes, rules, regulations, executive order, judgment, decree, case law, and/or other determination of an arbitrator or a court or other governmental authority ("Laws") throughout the Term. In addition, provided Sublandlord has delivered written copies to Subtenant, Subtenant shall comply with all rules regulations adopted from time to time for the Building. Sublandlord represents and warrants that the Subleased Premises, the Building and any the parking areas comply with all applicable Laws relating to handicapped accessibility, including, without limitation, the Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. §§12101 et seq. (1990).

15.     Environmental.

        (a)     Subtenant shall not cause or permit any hazardous or toxic substances, materials or waste, including, without limitation, medical waste and asbestos ("Hazardous Substances") to be used, generated, stored or disposed of in, on or under, or transported to or from, the Subleased Premises in violation of any applicable local, state, and federal laws, ordinances, statutes, rules, regulations, executive orders, judgments, decrees, case

9

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

law, and/or other determinations of an arbitrator or a court or other governmental authority, in each case applicable to or binding upon such person or any of its property or to which such person or any of its property is subject ("Laws"), whether now in existence or hereafter adopted, relating to Hazardous Substances or otherwise pertaining to the environment ("Environmental Laws"). Subtenant shall periodically cause to be removed from the Subleased Premises such Hazardous Substances placed thereon by Subtenant or Subtenant's agents, servants, employees or independent contractors in accordance with good business practices, such removal to be performed by persons or entities duly qualified to handle and dispose of Hazardous Substances. Without limiting the generality of the foregoing, Sublandlord acknowledges that the following Hazardous Substances, among others, are required for Subtenant's business operations: bleach, cidex, hibiclens, metricide, hydrogen peroxide and formaldehyde.    Upon the expiration or earlier termination of this Sublease, Subtenant shall cause all Hazardous Substances placed on the Subleased Premises by Subtenant to be removed from the Subleased Premises, at Subtenant's cost and expense and disposed of in strict accordance with Environmental Laws.

(b)    Subtenant shall indemnify, defend (by counsel reasonably acceptable to Sublandlord) and hold Sublandlord harmless, from and against any and all claims, liabilities, penalties, fines, judgment, forfeitures, losses, costs (including clean-up costs) or expenses (including reasonable attorney's fees, consultant's fees and expert's fees) for the death of or injury to any person or damage to any property whatsoever, arising from or caused in whole or in part, directly or indirectly, by (i) the presence after the Possession Date in, on, under or about the Subleased Premises of any Hazardous Substances caused by Subtenant or its agents, servants, employees, or independent contractors; (ii) any discharge or release by Subtenant or its agents, servants, employees, or independent contractors after the Possession Date in or from the Subleased Premises of any Hazardous Substances; (iii) Subtenant's use, storage, transportation, generation, disposal, release or discharge after the Possession Date of Hazardous Substances to, in, on, under, about or from the Subleased Premises; or (iv) Subtenant's failure to comply with any Environmental Law.

(c)    The indemnities set forth in this Section 15 shall survive termination or expiration of this Lease.

(d)    Subtenant shall promptly deliver to Sublandlord copies of all notices made by Subtenant to, or received by Subtenant from, any state, county, municipal or other agency having authority to enforce any Environmental Law ("Enforcement Agency") or from the United States Occupational Safety and Health Administration concerning environmental matters or Hazardous Substances at the Subleased Premises. Sublandlord shall promptly deliver to Subtenant copies of all notices received by Sublandlord from any Enforcement Agency or from the United States Occupational Safety and Health Administration concerning environmental matters or Hazardous Substances at the Subleased Premises.

10

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

16.     Quiet Enjoyment. Subtenant shall have the peaceable and quiet possession of the Subleased Premises during the Term.

17.     Parking. Subtenant may utilize 33 parking spaces on the north and west sides of the Building as depicted on the attached site plan attached hereto as Exhibit F. In the event the local government jurisdiction declares that there are any material compliance violations with parking and/or access codes related to the Subleased Premises and these violations cannot be remedied as a matter of law by Sublandlord, Subtenant and/or Landlord after the exhaustion of the parties legal remedies, then Subtenant may terminate the Sublease with 30 days written notice.

18.     Subtenant's Satellite and Cable Rights. Subject to Landlord's execution of the Landlord Consent, Subtenant shall have the right to place a satellite dish on the roof and run appropriate electrical cabling from the Subleased Premises to such satellite dish and/or install cable service to the Subleased Premises at no additional fee so long as Subtenant does not make any penetrations in the roof without involving the roofing contractor holding the roof warranty.   Landlord and Sublandlord shall reasonably cooperate with Subtenant's satellite or cable provider to ensure there is no delay in acquiring such services. Landlord and Sublandlord shall use commercially reasonable efforts to ensure that any subsequent rooftop user does not impair Subtenant's data transmission and reception and shall cooperate with Subtenant in eliminating any interference caused by any other party using the roof. Subtenant shall also have the right to run appropriate electrical cabling from the Subleased Premises to connect its electrical generator and associated transfer switch.

19.     Signage. Subject to Landlord's execution of the Landlord Consent and to the terms and conditions of the Lease, Subtenant shall have the right to erect, affix and display such signage as Subtenant may consider necessary or desirable on the exterior and interior walls, doors and windows of the Subleased Premises (including directional and designated parking signage in parking areas) and a sign on the exterior of the Building. Subject to Landlord's execution of the Landlord Consent and to the terms and conditions of the Lease, Subtenant shall have the right to install a panel on the existing pylon and/or monument sign(s) on any future signs erected on the Subleased Premises or elsewhere for the tenants of the Subleased Premises, in accordance with the rules and regulations of the Subleased Premises. All such signs shall comply with all applicable local municipal and state regulations and ordinances. Subtenant shall obtain Landlord's prior approval for the location and size of the signs on the exterior of the Building and each monument or pylon sign panel, which approval shall not be unreasonably withheld, conditioned or delayed.

20.     Notices. All notices, demands and requests which may be or are required to be given by either party to the other shall be in writing and sent by U.S. Certified Mail, Return Receipt requested or by overnight delivery. All notices to Sublandlord shall be addressed as set forth in the Data Sheet, or to any such other place as Sublandlord may from time to time designate in written notice to Subtenant.  All notices to Subtenant should be addressed to Subtenant at the address set forth in the Data Sheet or at such other place

11

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

as Subtenant may from time to time designate in written notice to Sublandlord. Notwithstanding anything contained in this Sublease to the contrary, any written notice by either Sublandlord or Subtenant to the other party may be transmitted by electronic transmission, and the electronic copies of such party's signature shall have the same effect as if it were an original signature.

21.     Sublandlord's Sale of the Building.  Upon Sublandlord's transfer of interest in the Subleased Premises or this Sublease (the "Sale"), Sublandlord shall be released from all liability to Subtenant and Subtenant's successors and assigns arising from this Sublease because of any act, occurrence or omission of Sublandlord occurring after such Sale, and Subtenant shall look solely to Sublandlord's successor in connection with the same; provided, however, that Sublandlord shall not be released from liability to Subtenant and Subtenant's successors and assigns from its obligations under this Sublease because of any act, occurrence or omission of Sublandlord occurring prior to such Sale or for any offsets due Subtenant under this Sublease in the event the successor in interest is a mortgagee which has not assumed liability for offsets, unless such liability is expressly assumed by Sublandlord's successor-in-interest in the Building and Subleased Premises.

22.     Regulatory Compliance.

(a)     Compliance.  Sublandlord and Subtenant agree that it is not the purpose of this Sublease to exert any influence over the reason or judgment of any party with respect to the referral of patients or other business between Sublandlord and Subtenant, but that it is the parties' expectation that any referrals which may be made between the parties shall be and are based solely upon the medical judgment and discretion of the patient's physician.  The parties further agree and acknowledge that (i) Rent is (A) set forth in advance; (B) consistent with fair market value in an arms-length transaction; (C) does not take into account the volume or value of any referrals or other business generated between the parties; and (D) would be reasonable even if no referrals were made between the parties, and (ii) the square footage of the Subleased Premises do not exceed the reasonable square footage needed for the legitimate business plans of Subtenant.

Each party represents and warrants that: (1) it is not currently excluded from participation in any federal health care program, as defined under 42 U.S.C. § 1320a-7b; (2) it is not currently excluded, debarred, suspended, or otherwise ineligible to participate in federal procurement and non-procurement programs; or (3) it has not been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended or otherwise declared ineligible (each, an "Exclusion"), and agrees to notify the other party within two business days of learning of any such Exclusion or any basis therefore.  In the event of learning of such Exclusion, either party shall have the right to immediately terminate this Sublease without further liability. Sublandlord agrees that Subtenant may screen Sublandlord against applicable Exclusion databases on an annual basis.  Subtenant shall have the right to terminate this Sublease if a change in applicable health care Laws or reimbursement systems affects the legality of this Lease.  Each party shall notify the other party of, and cooperate with, any request from a duly authorized government representative (e.g., Secretary of Health and Human

12

Services, Comptroller General) for access to books, documents and/or records related to this Sublease, and each party shall indemnify the other party from any liability arising out of the first party's refusal to grant such access.

The parties enter into this Sublease with the intent of conducting their relationship in full compliance with applicable federal, state and local Laws, including, without limitation, the Anti-Kickback Statute and agree and certify that neither party shall violate the Anti-Kickback Statute in performing under this Sublease. Notwithstanding any unanticipated effect of any provisions of this Sublease, neither party will intentionally conduct itself under the terms of this Sublease in a manner that would violate any such Law. Sublandlord agrees not to request an advisory opinion related to the legality of this Sublease without the concurrence and approval of Subtenant.

(b)     Cooperation with Cost Reporting Responsibilities.     Sublandlord's full cooperation with applicable authorities in connection with cost reporting is essential for Subtenant's continued operation of its business.     Therefore, Sublandlord agrees to provide to Subtenant, within thirty (30) days of Subtenant's request, any and all information that is reasonably necessary for Subtenant to fulfill its cost reporting requirements to such applicable authorities.

(c)     Protected Health Information.   Landlord and Sublandlord acknowledge and agree that from time to time during the Term, Landlord and/or its employees, representatives or assigns and Sublandlord and/or its employees, representatives or assigns may be exposed to, or have access to, Protected Health Information ("PHI"), as defined by the Health Insurance Portability and Accountability Act of 1996 and related regulations ("HIPAA"), 45 CFR Parts 160 and 164.   Landlord and Sublandlord agree that it will not use or disclose, and Landlord and Sublandlord shall cause its employees, or assigns not to use or disclose, PHI for any purpose unless required by a court of competent jurisdiction or by any governmental authority in accordance with the requirements of HIPAA and all other applicable medical privacy Laws.   Landlord and Sublandlord further agrees that, notwithstanding the rights granted to Sublandlord pursuant to this Sublease and Landlord pursuant to the Lease, except when accompanied by an authorized representative of Subtenant, neither Landlord nor Sublandlord nor its respective employees, agents, representatives or contractors shall be permitted to enter areas of the Subleased Premises designated by Subtenant as a location where patient medical records are kept or stored or where such entry is prohibited by applicable state or federal health care privacy Laws.

23.     Surrender of Subleased Premises.     Subtenant shall immediately vacate and surrender the Subleased Premises on the expiration or any earlier termination of this Sublease and shall contemporaneously remove all of Subtenant's personal property from the Subleased Premises.

24.     Holding Over.  In the event Subtenant remains in possession of the Subleased Premises after the expiration or earlier termination of this Lease, such possession shall constitute a month to month tenancy which tenancy shall be subject to the terms and

13

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

conditions of this Sublease including the payment of Rent in the manner as set forth herein. Notwithstanding the foregoing, in the event that applicable Law, including without limitation applicable health care Law, limits the period of any such holdover, both parties shall comply with such applicable Law.

25.     Brokerage Fee. Sublandlord and Subtenant each represent to the other that it has had no dealings with any real estate broker or agent in connection with the negotiation of this Sublease, except for Edwards Commercial Realty, LLC (the "Subtenant's Broker"), representing Subtenant, and CBRE, Inc. (the "Sublandlord's Broker"), representing Sublandlord. Sublandlord's Broker shall pay Subtenant's Broker a brokerage commission pursuant to a separate agreement.

26.     Binding Effect. All covenants, agreements, stipulations, provisions, conditions and obligations set forth herein shall extend to, bind and inure to the benefit of, as the case may require, the successors and assigns of Landlord, Sublandlord and Subtenant respectively, as fully as if any such successor or assign was referenced to wherever reference to Landlord, Sublandlord or Subtenant, as the case may be, occurs in this Lease.

27.     Severability. If any term, covenant or condition of this Sublease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Sublease shall be valid and be enforced to the fullest extent permitted by Law.

28.     Applicable Law. The Laws of the State where the Subleased Premises are located shall govern the validity, performance and enforcement of this Sublease, without regard to such State's conflict-of-law principles.

29.     Complete Agreement. Any stipulations, representations, promises or agreements, oral or written, made prior to or contemporaneously with this agreement shall have no legal consequences and the only agreement made and binding upon the parties with respect to the leasing of the Subleased Premises is this Lease, as the complete and total integration of the intent and understanding of Sublandlord and Subtenant.     No amendment or modification of this Sublease shall be valid or binding unless reduced to writing and executed by the parties hereto.

30.     Counterparts. This Sublease may be executed electronically or otherwise in any number of counterparts via electronic transmission or otherwise, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

31.     Waiver. The failure of any party to insist in any one or more instances upon performance of any terms or conditions of this Sublease shall not be construed as a waiver of future performance of any such term, covenant, or condition, and the obligations of such party with respect thereto shall continue in full force and effect.

14

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

32.     Incorporation of Recitals, Exhibits, and Data Sheet.   This Sublease is subject to the provisions of the Recitals set forth above, the Data Sheet, and the attached Exhibits A-F, which Recitals, Data Sheet, and Exhibits are hereby made a part of this Sublease.

33.     Landlord's Consent.   This Sublease shall not become effective and shall not bind the parties until Landlord has given its written consent to this Sublease.  Sublandlord will promptly deliver to Landlord any information reasonably requested by Landlord.

Albuquerque, NM (1720 Wyoming NE) (United Urology Centers LLC)
48196323;11

IN TESTIMONY WHEREOF, Sublandlord and Subtenant have caused this Sublease to be executed as of the dates set forth below to have effect as of the Effective Date.

**SUBLANDLORD**:

**SUBTENANT**:

United Urology Centers, LLC, a Delaware limited liability company

DaVita Medical Group New Mexico, LLC, a Delaware limited liability company

By: _____

By: _____
Jason Schulz

Name: _____ Russell Newman _____

Name: _____ Jason Schulz _____

Title: _____ President of the Manager _____

Title: _____ CFO _____

Date: _____ May 14, 2019 _____

Date: _____ 5/10/2019 _____

FOR SUBTENANT'S INTERNAL USE APPROVAL AS TO FORM ONLY:

By: _____
Sumaya Vanderhorst

Name: _____ Sumaya Vanderhorst _____

Title: _____ VP, Associate General Counsel _____

16

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

## LANDLORD CONSENT AND AGREEMENT

THIS LANDLORD CONSENT AND AGREEMENT (this "Landlord Consent"), dated for reference purposes only as of _____ ("Reference Date") is by and among J. EDWIN ENG, as trustee of the J. Edwin Eng Living Trust u/t/d February 9, 1995 and CHARLES L. HOSTETTER, as trustee of the Charles L. Hostetter Living Trust u/t/d February 9, 1995 ("Landlord"), UNITED UROLOGY CENTERS LLC, a Delaware limited liability company ("Sublandlord") and DAVITA MEDICAL GROUP NEW MEXICO, LLC, a Delaware limited liability company ("Subtenant").,

Effective as of the Effective Date of the above Sublease Agreement by and between Sublandlord and Subtenant (the "Sublease"), for and in consideration of the mutual covenants contained in this Landlord Consent and for other good and valuable consideration exchanged by each of the parties to this Landlord Consent, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.     Notwithstanding anything contained to the contrary in the Lease, Landlord hereby consents to the Sublease and the terms and conditions contained therein, including but not limited to Sections 5, 6, 8, 13, 17, 18, 19, and 22(c) therein, and furthermore, notwithstanding anything contained to the contrary in the Lease:

A.     Sublandlord shall not be released from its obligations under the Lease. Any default of Sublandlord under the Lease shall be a default of Sublandlord under the Sublease.

B.     Landlord agrees and acknowledges Subtenant's right to assign and sublease the Subleased Premises without Landlord's consent and Sublandlord's consent as set forth in Section 8 of the Sublease.

C.     Landlord agrees and acknowledges that the maintenance and repair obligations of Landlord under the Lease to the Premises shall remain the maintenance and repair obligation of Landlord. Landlord also agrees and acknowledges that Subtenant shall contract directly with a janitorial service provider of its choice for the provision of janitorial services in the Subleased Premises and that Landlord shall not charge Sublandlord for the cost of any janitorial services provided to the Subleased Premises.

D.     Landlord represents that no covenants, restrictions, liens or other encumbrances affecting the real property upon which the Building is constructed interfere with or adversely affect Subtenant's use of the Subleased Premises for the permitted use, parking, or any common areas under the Sublease.

E.     Landlord agrees and acknowledges Subtenant's right to construct Subtenant Improvements and make Alterations as set forth in Section 6 of the Sublease.

F.     Landlord represents and warrants that per Section 5 of the Lease, it installed a 1-inch overlay, in a workmanlike and professional manner, of the parking lot servicing the Premises.

17

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

G.     Landlord agrees that Subtenant may use hazardous wastes or hazardous substances used in connection with the provision of primary care services so long as Subtenant uses, stores, handles, transports, treats, and disposes of the same in accordance with all applicable laws.  Subtenant hereby indemnifies, defends, and holds Landlord harmless from all damages, liabilities, and claims arising from Subtenant's use, storage, handling, transport, and disposal of any hazardous materials or substances in, on, under, or around the Building.

H.     Landlord agrees that if the Lease shall expire or terminate for any reason, then so long as the Sublease shall be in full force and effect and Subtenant shall not be in default hereunder beyond any applicable notice and cure period, then (A) the Sublease shall become a direct lease between Landlord and Subtenant with respect to the Subleased Premises upon all of the terms, covenants and conditions of this Sublease, in which event, Landlord shall take over all of the right, title and interest of Sublandlord under this Sublease, and all references to the Lease in the Sublease shall be deemed deleted and of no further force or effect, and (B) Subtenant will attorn to Landlord, except that Landlord shall not be liable for any previous act or omission of Sublandlord under the Sublease. Landlord agrees to execute and deliver such documents necessary to give effect to the conversion of the Sublease into a direct lease with Landlord in commercially reasonable forms with terms mutually acceptable to Landlord and Subtenant within 60 days after request by Subtenant.

I.     Landlord agrees that Subtenant may carry any insurance required by the Lease under a blanket policy or under a policy containing a self-insured retention.  Landlord agrees Subtenant's general liability insurance policy limits shall be $1,000,000 per occurrence and $3,000,000 in aggregate.

J.     Landlord agrees that Subtenant shall not be required to indemnify Landlord for any accident, injury to or death of persons or loss of or damage to property occurring on or about the Premises or adjoining sidewalks, including without limitations any claims of malpractice arising out of Tenant's use of the Premises pursuant to Section 12(a) of the Lease.

K.     Neither Landlord nor its employees, agents, representatives or contractors shall be permitted to enter areas of the Subleased Premises designated by Subtenant as location where patient medical records are kept or stored or where such entry is prohibited by applicable state or federal health care privacy Laws.

L.     The parties acknowledge and agree to be bound by all of the terms and conditions of this Landlord Consent and acknowledge that Landlord has agreed to execute this Landlord Consent based upon Sublandlord's and Subtenant's acceptance of the terms and conditions hereof.  As further inducement for Landlord to grant its consent to the Sublease, Sublandlord represents and warrants to Landlord and Subtenant that the Lease is in full force and effect and that to the best of its knowledge as of the date hereof, that Sublandlord has no claims, counterclaims, defenses or set-offs against Landlord arising from or out of a breach or default by Landlord under the Lease, that neither

18

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

Landlord nor Sublandlord is in default under any terms of the Lease, nor has any event occurred which, with the passage of time or giving of notice (or both), will constitute an event of default under the Lease, and that no fact or circumstance exists as of the date hereof which would permit Sublandlord to terminate the Lease.

M.      Landlord represents and warrants to Sublandlord and Subtenant that the Lease is in full force and effect and that, to the best of its knowledge as of the date hereof, that Landlord has no claims, counterclaims, defenses or set-offs against Sublandlord arising from or out of a breach or default by Sublandlord under the Lease, that neither Landlord nor Sublandlord is in default under any terms of the Lease, nor has any event occurred which, with the passage of time or giving of notice (or both), will constitute an event of default under the Lease, and that no fact or circumstance exists as of the date hereof which would permit Landlord to terminate the Lease.

N.      All capitalized terms in this Landlord Consent, unless otherwise defined, shall have the same meaning as set forth in the Sublease.

O.      This Landlord Consent may be executed electronically or otherwise in any number of counterparts via electronic transmission or otherwise, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

P.      All covenants, agreements, stipulations, provisions, conditions and obligations set forth herein shall extend to, bind and inure to the benefit of, as the case may require, the successors and assigns of Sublandlord, Subtenant, and Landlord respectively, as fully as if any such successor or assign was referenced to wherever reference to Sublandlord, Subtenant, or Landlord as the case may be, occurs in this Landlord Consent. If there be more than one Sublandlord, Subtenant, or Landlord the obligations hereunder imposed upon Sublandlord, Subtenant or Landlord, as applicable, shall be joint and several.

Q.      If any term, covenant or condition of this Landlord Consent or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Landlord Consent, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Landlord Consent shall be valid and be enforced to the fullest extent permitted by Law.

R.      The Laws of the State where the Subleased Premises are located shall govern the validity, performance and enforcement of this Landlord Consent, without regard to such State's conflict-of-law principles.

[Signature pages follow]

19

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

IN TESTIMONY WHEREOF, Landlord, Sublandlord, and Subtenant have caused this Landlord Consent to be executed as a sealed instrument, on the dates set forth below.

**LANDLORD:**

**J. EDWIN ENG,**
as trustee of the J. Edwin Eng
Living Trust u/t/d February 9, 1995

**CHARLES L. HOSTETTER**
as trustee of the Charles L. Hostetter
Living Trust u/t/d February 9, 1995

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

Date: _____

Date: _____

**SUBLANDLORD:**

**SUBTENANT:**

UNITED UROLOGY CENTERS, LLC, a
Delaware limited liability company

DAVITA   MEDICAL   GROUP   NEW
MEXICO, LLC,
a Delaware limited liability company

By: _____

Name: _____Russell Newman_____

Title: _____President of the Manager_____

Date: _____May 14, 2019_____

By: _____
    Jason Schulz

Name: _____Jason Schulz_____

Title: _____CFO_____

Date: _____5/10/2019_____

FOR SUBTENANT'S INTERNAL USE
APPROVAL AS TO FORM ONLY:

By: _____
    Sumaya Vanderhorst

Name: _____Sumaya  Vanderhorst_____

Title:_____VP, Associate General Counsel_____

20

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

IN TESTIMONY WHEREOF, Landlord, Sublandlord, and Subtenant have caused this Landlord Consent to be executed as a sealed instrument, on the dates set forth below.

**LANDLORD:**

**J. EDWIN ENG,**
as trustee of the J. Edwin Eng
Living Trust u/t/d February 9, 1995

By: _J. Edwin Eng, Ttee_

Name: _J Edwin Eng_

Title: _Landlord_

Date: _5/14/2019_

**CHARLES L. HOSTETTER**
as trustee of the Charles L. Hostetter
Living Trust u/t/d February 9, 1995

By: _Charles L. Hostetter, Ttee_

Name: _Charles L. Hostetter_

Title: _Landlord_

Date: _May 14 2019_

**SUBLANDLORD:**

UNITED UROLOGY CENTERS, LLC, a
Delaware limited liability company

By: _Russell Newman_

Name: _____Russell Newman_____

Title: ____President of the Manager____

Date: _____May 14, 2019_____

**SUBTENANT:**

DAVITA   MEDICAL   GROUP   NEW
MEXICO, LLC,
a Delaware limited liability company

By: _Jason Schulz_
DocuSigned by:

Name: _____Jason Schulz_____

Title: _____CFO_____

Date: _____5/10/2019_____

FOR SUBTENANT'S INTERNAL USE
APPROVAL AS TO FORM ONLY:

By: _Sumaya Vanderhorst_
DocuSigned by:

Name: _____Sumaya  Vanderhorst_____

Title:____VP, Associate General Counsel____

20

Albuquerque, NM (1720 Wyoming NE) (United Urology Centers LLC)
4819632311

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

## EXHIBIT A

### SUBLEASED PREMISES FLOOR PLAN



Albuquerque, NM (1720 Wyoming NE) (United Urology Centers LLC)
48196323;11

A-1

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

## **EXHIBIT B**

**LEASE**
**(attached)**

Albuquerque, NM (1720 Wyoming NE) (United Urology Centers LLC)
48196323;11

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

Authentisign ID: 297193D6-FE6A-4350-8B46-105FE6DA7F39

AMENDMENT TO LEASE AGREEMENT BETWEEN

**J. EDWIN ENG,**
**as trustee of the J. Edwin Eng**
**Living Trust u/t/d February 9, 1995**

**CHARLES L. HOSTETTER**
**as trustee of the Charles L.**
**Hostetter Living Trust u/t/d**
**February 9, 1995**

**AS LANDLORD**

**AND**

**UNITED UROLOGY CENTERS, LLC**
**AS TENANT**

**DATED: April 30. 2019**

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

Authentisign ID: 2971B3D6-FE6A-4350-8B46-105FE6DA7F39

## AMENDMENT TO LEASE AGREEMENT

This Amendment to Lease Agreement (this "Amendment" the original Lease is referred to herein as "Lease") is executed as of April 30, 2019, between **Landlord** (as defined below), and **UNITED UROLOGY CENTERS, LLC** ("Tenant").

**WHEREAS**, on January 27, 2017 MV Industries Real Estate, LLC (the "Prior Landlord") and Tenant entered into the Lease;

**WHEREAS**, on September 8, 2017 **J. EDWIN ENG, as trustee of the J. Edwin Eng Living Trust u/t/d February 9, 1995** and **CHARLES L. HOSTETTER as trustee of the Charles L. Hostetter Living Trust u/t/d February 9, 1995** succeeded in interest to Landlord and are referred to herein as "Landlord";

**WHEREAS**, the Landlord and Tenant desire to amend the Lease as set forth below;

**NOW THEREFORE**, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1. The Lease is hereby amended to delete the existing Paragraph 2(c) (entitled "Percentage Rent") in its entirety and include a new Paragraph 2(c) that reads as follows:

(c) <u>Additional Rent</u>. In addition to the Base Rental, commencing in the third year of the term of this Lease, Tenant shall pay to Landlord two thousand dollars per month ($2,000.00).

2. In all other respects the Lease shall remain unchanged and in full force and effect.

**WHEREFORE**, each of the parties has accepted and agreed by affixing their respective authorized signatures below as of the date first above written.

**LANDLORD**:

| | |
|---|---|
| **J. EDWIN ENG,** | **CHARLES L. HOSTETTER** |
| as trustee of the J. Edwin Eng | as trustee of the Charles L. Hostetter |
| Living Trust u/t/d February 9, 1995 | Living Trust u/t/d February 9, 1995 |

By: *J. Edwin Eng*
— 5/2/2019 1:30:00 PM MDT

By *Charles L. Hostetter*
— 5/2/2019 1:27:54 PM MDT

Name: _____

Name: _____

Title: _____

Title: _____

Date: _____

Date: _____

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

Authentisign ID: 2971B3D6-FE6A-4350-8B46-105FE6DA7F39

**TENANT**:

UNITED UROLOGY CENTERS, LLC, a
Delaware limited liability company

By: _____

Name: _RUSSELL NEHMAN_

Title: _PRESIDENT OF MANAGER_

Date: _MAY 6, 2019_

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

## LEASE AGREEMENT

This Lease Agreement ("Lease") is entered into this 27th day of January, 2017, by and between **MV INDUSTRIES REAL ESTATE, LLC** ("Landlord"), and **UNITED UROLOGY CENTERS, LLC** ("Tenant").

WHEREAS, Landlord desires to lease to Tenant the Premises located at 1720 WYOMING BLVD NE, ALBUQUERQUE, NEW MEXICO (the "Premises") and Tenant desires to lease the Premises and enter into such Lease;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties agree as follows:

1.      Term: As of the effective date of this Lease, all other agreements between the Landlord and Tenant are null and void and of no effect. This Lease supersedes all other agreements between Landlord and Tenant. The term of this Lease shall be for sixty (60) months commencing effective on February 1, 2017, and ending on January 31, 2022, (hereinafter referred to as the "Termination Date"), unless sooner terminated as provided herein.

2.      Rent. Tenant shall pay Landlord, at Landlord's office at 2920 Stanford Drive N.E., Suite C, Albuquerque, New Mexico 87107 or at such other place as Landlord may from time to time designate in writing, the following amounts:

(a)     Base Rental. The annual sum of One Hundred Eighty Thousand Dollars ($180,000.00) payable monthly in advance and in installments of Fifteen Thousand Dollars and 00 Cents ($15,000.00) during the term of this Lease.

(b)     Taxes. Tenant shall pay 100% of all taxes, including, without limitation, all ad valorem taxes on the Premises, sales and use, gross receipts, transaction privilege, or similar taxes as the same relate to or are imposed upon the Premises or Tenant or its business.

(c)     Percentage Rent. In addition to Base Rental, Tenant shall pay to Landlord twenty percent (20%) of Tenant's net income, as defined by GAAP, for non-urological procedures conducted on the Premises (referred to herein as "Percentage Rent"). Such Percentage Rent shall be payable each month by Tenant to Landlord together with Tenant's Base Rent. At the Landlord's request, which may not occur more than semi-annually, Tenant shall provide such documentation necessary to confirm the accuracy of the Percentage Rent paid hereunder. In addition to the Base Rental, commencing in the third year of the term of this Lease, Tenant shall pay the greater of two thousand dollars per month ($2,000.00) or the Percentage Rent.

(d)     Tenant Improvement. As of January 1, 2017, Landlord is indebted to Tenant for tenant improvements ("Tenant Improvement Debt") in the sum of sixty-five thousand one hundred forty-one dollars ($65,141.00). Tenant shall reduce monthly rent by one thousand dollars ($1,000.00), which will be applied to the Tenant Improvement Debt, over the next twenty-four (24) months until the Tenant Improvement Debt is paid in full. On the first day of the twenty fifth month (25th) of this Lease March 1, 2019, term. Landlord shall pay to Tenant the balance of twenty thousand seven hundred one dollar ($20,701.00), or the then outstanding balance, in a lump sum. The Landlord's failure to pay the Tenant Improvement Debt, as set forth in this paragraph 2(d), will be a material default of this Lease. If Landlord fails to pay the Tenant Improvement Debt as set forth in this paragraph 2(d), the Tenant may offset the sums due Tenant against any outstanding rent obligation to Landlord or may terminate this Lease. Landlord's

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

payment obligation to Tenant set forth in this paragraph 2(d) shall survive termination of this Lease for any reason including, but not limited to, termination by reason of Tenant's exercise of its purchase option and/or first right of refusal option set forth in paragraph 22 of this Lease.

3.      Use. Tenant shall use and occupy the Premises for the purpose of operating an ambulatory medical surgery center. The Premises shall be used for no other purpose. Landlord represents that the Premises may lawfully be used for such purpose.

4.      Security Deposit. Tenant has deposited with Landlord the sum of twenty thousand dollars ($20,000.00) ("Security Deposit") as security for the full and faithful performance of every provision of this Lease to be performed by Tenant. If Tenant defaults with respect to any provision of this Lease, Landlord may use, apply or retain all or any part of this Security Deposit for the payment of any sum in default, or for the payment of any other amount which Landlord may spend or become obligated to spend by reason of Tenant's default or to compensate Landlord for any other loss or damage which Landlord may suffer by reason of Tenant's default. If any portion of said deposit is to be used or applied, Tenant shall within ten (10) days after written demand therefor deposit cash with Landlord in an amount sufficient to restore the Security Deposit to its original amount. The Security Deposit or any balance thereof shall be returned to Tenant within thirty (30) days after the expiration of the term of this Lease.

5.      Care and Maintenance of Premises: Tenant acknowledges that the Premises are in good order and repair, unless otherwise indicated herein. Tenant shall at its own expense and at all times, maintain the interior Premises in good and safe condition, plate glass, electrical wiring, plumbing and heating installations, and any other system or equipment upon the Premises and shall surrender the same, at termination hereof, in as good condition as received normal wear and tear excepted. ("Tenant's Maintenance Obligations"). Tenant shall be responsible for all repairs required for Tenant's Maintenance Obligation, excepting roof repairs and structural foundations which shall be maintained by Landlord. Notwithstanding the foregoing, Landlord shall be responsible for all Tenant Maintenance Obligations required as a result of Landlord's negligence or damage to the Premises caused by Landlord or Landlord's invitee. No later than June 30, 2017 Landlord shall do a 1-inch overlay, in a workmanlike and professional manner, of the parking lot servicing the Premises. Except for any damage caused by the negligence of Tenant, Tenant's employees or Tenant's invitees, Landlord, at its sole cost and expense, will keep the private roadways, sidewalks, foundations, roofs, landscaping, driveways, all structural systems of the Premises and curbs appurtenant ("Exterior Items") in good order and repair and, except as otherwise provided herein, with reasonable promptness, Landlord shall make all necessary and appropriate repair thereto of every kind and nature.

6.      Alterations. Tenant shall not, without first obtaining the written consent of Landlord, make any material alterations, additions, or improvements, in to or about the Premises.

7.      Ordinances and Statutes: Tenant shall comply with all statutes, ordinances and requirements of all municipal, state and federal authorities now in force, or which may hereafter be in force, pertaining to the Premises, occasioned by or affecting the use thereof by Tenant.

8.      Subletting and Assignment. Tenant may not assign, sublet, encumber, pledge or otherwise transfer this Lease or the leasehold or other interest in the Premises in whole or in part without the prior written consent of Lessor, which will not be unreasonably denied. Any consent of Landlord to any assignment or subletting shall not operate to discharge Tenant from Tenant's liability under this Lease, and Tenant shall remain primarily liable for the payment of the rent and full and complete performance of all of the terms, conditions, covenants, and agreements to be performed by Tenant contained in this Lease as a principal and not as a guarantor or surety, to the same extent as though no assignment or sublease had been made. Further, any consent of Landlord to any assignment or subletting shall not operate as a consent

2

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

to further assignment or subletting, and the assignee and/or subletee shall be bound by all of the terms, conditions, covenants, and agreements contained in this Lease, including the covenant against assignment and subletting. In no event shall Tenant be prohibited from assigning or subleasing this Lease to an affiliated, parent or subsidiary company of Tenant.

9.     Utilities. All applications and connections for necessary utility service on the demised Premises shall be made in the name of Tenant only, and Tenant shall be solely liable for utility charges as they become sue, including those for sewer, waste, gas, electricity and telephone services.

10.    Entry and Inspection. Tenant shall permit Landlord or Landlord's agents to enter upon the Premises at reasonable times and upon twenty-four (24) hours prior written notice (or, in the case of an emergency, at any time and without notice, but only if prior notice to Tenant is not possible), for the purpose of inspecting the same, and will permit Landlord at any time within sixty (60) days prior to the expiration of this lease, to place upon the Premises any usual "To Let" or "For Lease" signs, and permit persons desiring to lease the same to inspect the Premises hereunder.

11.    Possession. If Landlord is unable to deliver possession of the Premises at the commencement hereof, Landlord shall not be liable for any damage caused thereby; nor shall this Lease be void or voidable, but Tenant shall not be liable for any rent until possession is delivered. Tenant may terminate his Lease if possession is not delivered within five days of the commencement of the term hereof.

12.    Indemnification. Notwithstanding the existence of any insurance provided for in this Lease, and without regard to the policy limits of any such insurance, Tenant will protect, indemnify, save harmless and defend Landlord from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses), to the extent permitted by law, imposed upon or incurred by or asserted against Landlord by reason of: (a) any accident, injury to or death of persons or loss of or damage to property occurring on or about the Premises or adjoining sidewalks, including without limitation any claims of malpractice arising out of Tenant's use of the Premises, (b) any occupancy, use, misuse, non-use, condition, maintenance or repair by Tenant of the Premises, (c) any Impositions (which are the obligations of Tenant to pay pursuant to the applicable provisions of this Lease), (d) any failure on the part of Tenant to perform or comply with any of the terms of this Lease, and (e) the non-performance of any of the terms and provisions of any and all existing and future subleases of the Premises to be performed by the landlord (Tenant) thereunder. Any amounts which become payable by Tenant under this Lease shall be paid within thirty (30) days of the date the same becomes due and if not timely paid, shall bear a late charge (to the extent permitted by law) of five percent (5%) from the date of such determination to the date of payment. Tenant, at its expense, shall contest, resist and defend any such claim, action or proceeding asserted or instituted against Landlord or may compromise or otherwise dispose of the same as Tenant sees fit, at Tenant's sole cost. Nothing herein shall be construed as indemnifying Landlord against its own negligent acts or omissions or willful misconduct or against the acts or omissions of any subsequent lessee of the Premises in the event of the termination by Landlord of Tenant's right to possession of the Premises without termination of this Lease. Tenant's liability for a breach of the provisions of this Lease arising during the term of this Lease shall survive any termination of this Lease. To the extent, if at all, NMSA (1978), § 56-7-1 is applicable to any claim brought pursuant to this Lease, this indemnification provision shall not be interpreted or applied so as to require indemnification of the indemnitee for (i) claims for bodily injury to persons or damage to property caused by or resulting from, in whole or in part, the negligence, act or omission of the indemnitee, its officers, employees or agents, or (ii) any other claim that would make this indemnification void, unenforceable and/or a violation of the public policy of the State of New Mexico.

3

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

13.    Insurance.

13.1    General Insurance Requirements. During the term of this Lease, Tenant shall at all times keep the Premises, and all property located in or on the Premises, including Tenant's personal property, insured with the kinds and amounts of insurance described below. This insurance shall be written by companies authorized to do insurance business in the state in which the Premises is located. The policies shall name Landlord as an additional insured. Losses shall be payable to Landlord or Tenant as provided in this Lease. In addition, upon Landlord's written request, the policies shall name as an additional insured the holder ("Facility Mortgagee") of any mortgage, deed of trust or other security agreement and any other encumbrance now existing of record or hereafter placed on the Premises ("Facility Mortgage") by way of a standard form of mortgagee's loss payable endorsement. Any loss adjustment shall require the written consent of Landlord, each Facility Mortgagee, and (if permitted by the terms of any Facility Mortgage) Tenant. Evidence of insurance shall be deposited with Landlord and, if requested, with any Facility Mortgagee(s). The policies on the Premises, shall comply with the without limitation, insurance against the following risks:

(a)    Loss or damage by fire, vandalism and malicious mischief, extended coverage perils commonly known as "All Risk," and all physical loss perils normally included in such All Risk insurance, including but not limited to sprinkler leakage, in an amount not less than one hundred percent (100%) of the then full replacement cost thereof;

(b)    Loss or damage by explosion of steam boilers, pressure vessels or similar apparatus, now or hereafter installed in the Premises, in such amounts with respect to any one accident as may be reasonably requested by Landlord from time to time;

(c)    Loss of rental under a rental value insurance policy covering risk of loss during the first twelve (12) months of reconstruction necessitated by the occurrence of any of the hazards described in paragraph 15 in an amount sufficient to prevent Landlord from becoming a co-insurer;

(d)    Claims for personal injury or property damage under a policy of commercial general public liability insurance with amounts not less than $5,000,000.00 per occurrence, $5,000,000.00 aggregate, with a $5,000,000.00 umbrella policy;

(e)    Flood (when the Premises is located in whole or in part within a designated flood plain area) and such other hazards and in such amounts as may be customary for comparable properties in the area and is available from insurance companies authorized to do business in the state in which the Premises is located at rates which are economically practicable in relation to the risks covered.

13.2    Replacement Cost. The term "full replacement cost" as used herein, shall mean the actual replacement cost of the Premises requiring replacement from time to time including an increased cost of construction endorsement, less exclusions provided in the standard form of fire insurance policy. In the event either party believes that full replacement cost (the then replacement cost less such exclusions) has increased or decreased at any time during the term of this Lease, it shall have the right to have such full replacement cost re-determined.

13.3    Additional Insurance. In addition to the insurance described above, Tenant shall maintain such additional insurance as may be reasonably required from time to time by Landlord or any Facility Mortgagee and shall further at all times maintain officers and directors' liability insurance, and adequate worker's compensation insurance coverage for all persons employed by Tenant on the Premises. Such worker's compensation insurance shall be in accordance with the requirements of applicable local, state and federal law.

4

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

13.4     Waiver of Subrogation. All insurance policies carried by either party covering the Premises, the fixtures, the facility, or Tenant's personal property including without limitation, contents, fire and casualty insurance, shall expressly waive any right of subrogation on the part of the insurer against the other party. The parties hereto agree that their policies will include such waiver clause or endorsement so long as the same are obtainable without extra cost, and in the event of such an extra charge the other party, at its election, may pay the same, but shall not be obligated to do so.

13.5     Certificates. Tenant shall pay all of the premiums for the policies of insurance referred to in this paragraph 13, and deliver certificates thereof to Landlord prior to their effective date (and, with respect to any renewal policy, prior to the expiration of the existing policy). Each insurer mentioned in this paragraph 13 shall agree, by endorsement on the policy or policies issued by it, or by independent instrument furnished to Landlord, that it will give to Landlord (and to any Facility Mortgagee, if required by the same) thirty (30) days' written notice before the policy or policies in questions shall be altered, allowed to expire or canceled.

13.6     Blanket Policy. Notwithstanding anything to the contrary contained in this paragraph 13, unless the holder of any Facility Mortgage does not consent to blanket policy coverage, Tenant's obligations to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant; provided, however, that the coverage afforded Landlord will not be reduced or diminished or otherwise be different from that which would exist under a separate policy meeting all other requirements of this Lease by reason of the use of such blanket policy of insurance.

14.     Eminent Domain. If the Premises or any part thereof or any estate therein, or any other part of the building materially affecting Tenant's use of the Premises, shall be taken by eminent domain, this Lease shall terminate on the date when title vests pursuant to such taking. The rent, and any additional rent, shall be apportioned as the termination date, and any rent paid for any period beyond that date shall be repaid to Tenant. Tenant shall not be entitled to any part of the award for such taking or any payment in lieu thereof, but Tenant may file a claim for any taking of fixtures and improvements owned by Tenant, and for moving expenses.

15.     Casualty.

15.1     Insurance Proceeds. All proceeds payable by reason of any loss of or damage to the Premises, or any portion thereof, which is insured under any policy of insurance required by paragraph 13 of this Lease, where the total proceeds paid by the insurer are less than $5,000.00, shall be paid to Tenant and applied to the reconstruction or repair, as the case may be, of any damage to or destruction of the Premises, or any portion thereof. All proceeds payable by reason of any loss of or damage to the Premises (but not including Tenant's personal property), or any portion thereof, which is insured under any policy of insurance required by paragraph 13 of this Lease where the total proceeds paid by the insurer are equal to or in excess of $5,000.00 shall be paid to Landlord and held by Landlord and made available for reconstruction or repair, as the case may be, of any damage to or destruction of the Premises, or any portion thereof, and shall be promptly and timely paid out by Landlord from time to time for the reasonable costs of such reconstruction or repair. Any excess proceeds of insurance remaining after the completion of the restoration or reconstruction of the Premises (whether or not the total proceeds paid by the insurer exceed $5,000.00) shall be paid to Tenant. In the event neither Landlord nor Tenant is required or elects to repair and restore, and the Lease is terminated as provided by this Lease, all such insurance proceeds shall be retained by Landlord (except for insurance proceeds relating to Tenant's personal property). All salvage resulting from any risk covered by insurance shall belong to Landlord except that any salvage

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

relating to Tenant's personal property shall belong to Tenant. Tenant recognizes that its rights hereunder are subordinate to the rights of the holders of any existing Facility Mortgage of record.

15.2    Reconstruction in the Event of Damage or Destruction Covered by Insurance Proceeds. In case the Premises shall be rendered untenantable by fire, explosion or other casualty (a "Casualty"), Landlord shall, within sixty (60) days after the date of such casualty, deliver to Tenant an estimate of the duration of the period in which the Premises will be untenantable, as reasonably determined by Landlord. If the estimate provides that damage cannot reasonably be repaired within one hundred eighty (180) days after the date of the casualty, either party may, at its option, terminate this Lease by written notice to the other given within sixty (60) days after the date of the casualty. If the estimate provides that the damage can be repaired within such one hundred eighty (180) day period, then Landlord shall repair the Premises within a reasonable period of time, given the extent of the damage. If Landlord elects to repair the Premises, this Lease shall remain in full force and effect. Such election shall be made by Landlord within sixty (60) days after the occurrence of the casualty and such repairs shall be completed within one hundred (180) days from the date Landlord made the election to repair, subject to reasonable delays for insurance adjustments and delays caused by matters beyond Landlord's reasonable control.

15.3    Tenant's Property. All insurance proceeds payable by reason of any loss of or damage to any of Tenant's personal property shall be paid to Tenant, and should Landlord elect to repair the premises pursuant to the terms of this Lease, then Tenant shall hold such insurance in trust to pay the cost of repairing or replacing damaged Tenant's personal property.

15.4    Restoration of Tenant's Property. Without limiting Tenant's obligation to restore the Premises as provided in this paragraph 15, Tenant shall also restore all alterations and improvements made by Tenant, including Tenant's personal property, but only to the extent that Tenant's personal property is necessary to the operation of the Premises for its intended use as stated in paragraph 3 of this Lease.

15.5    Abatement of Rent. Tenant's obligation to make rental payments and to pay all other charges required by this Lease shall abate for any portion of the Premises that is tenantable as result of a casualty from the date of such casualty and through any period required for repair and restoration.

15.6    Damage Near End of Term. Notwithstanding any provisions of this Lease appearing to be contrary, if damage to or destruction of the Premises occurs during the last twenty-four (24) months of the term of this Lease, including any extended terms as to which Tenant exercised its option prior to the occurrence of such damage or destruction, and if such damage or destruction cannot be fully repaired and restored within six (6) months immediately following the date of damages or destruction, then Tenant shall have the right to terminate this Lease by giving written Notice to Landlord within thirty (30) days after the date of damage or destruction, in which case, all insurance proceeds (except for insurance proceeds related to Tenant's personal property) shall be paid to Landlord.

16.    Events of Default.

16.1    Any one or more of the following events shall be an "Event of Default":

(a)    if Tenant fails to make payment of the rent payable by Tenant under this Lease when the same becomes due and payable and such failure is not cured by Tenant within fifteen (15) days after Notice thereof from Landlord; or

(b)    if Tenant fails to perform or observe any other monetary terms, covenants or conditions of this Lease and such failure is not cured by Tenant within fifteen (15) days after Notice thereof from Landlord; or

(c)    if Tenant fails to observe or perform any other nonmonetary term, covenant or condition of this Lease and such failure is not cured by Tenant within a period of thirty (30) days after Notice thereof from Landlord, unless such failure cannot with due diligence be cured within a period of thirty (30) days, in which case such failure shall not be deemed an Event of Default if Tenant proceeds promptly and with due diligence to cure the failure and diligently completes the curing thereof. No Event of Default shall be deemed to exist under this clause (c) during any time the curing thereof is prevented by an unavoidable delay, provided that upon the cessation of such unavoidable delay, Tenant shall remedy such default without further delay; or

(d)    if Tenant does any of the following:

(i)    admit in writing its inability to pay its debts generally as they become due,

(ii)    file a petition in bankruptcy or a petition to take advantage of any insolvency law,

(iii)    make a general assignment for the benefit of its creditors,

(iv)    consent to the appointment of a receiver of itself or of the whole or any substantial part of its property, or

(v)    file a petition or answer seeking reorganization or arrangement under the Federal bankruptcy laws or any other applicable law or statute of the United States of America or any state thereof; or

(e)    if Tenant, on a petition in bankruptcy filed against it, is adjudicated bankrupt or an order for relief thereunder is entered against it or a court of competent jurisdiction shall enter an order or decree appointing, without the consent of Tenant, a receiver for Tenant or of the whole or substantially all of its property, or approving a petition filed against Tenant seeking reorganization or arrangement of Tenant under the federal bankruptcy laws or any other applicable law or statute of the United States of America or any state thereof and such judgment, order or decree shall not be vacated or set aside or stayed within 120 days from the date of the entry thereof; or

(f)    if the estate or interest of Tenant in the Premises or any part thereof be levied upon or attached in a proceeding and the same shall not be vacated or discharged within the later of 120 days after commencement thereof or sixty (60) days after Notice thereof from Landlord; or

(g)    if, except as a result of damage, destruction or a partial or total condemnation, Tenant voluntarily ceases operations on the Premises; or

(h)    if any of Tenant's representations or warranties expressly set forth in this Lease (or financial statements provided to Landlord) proves to be untrue when made in any material respect which materially and adversely affects Landlord.

Upon the occurrence of an Event of Default, in addition to all of Landlord's other remedies, Landlord may terminate this Lease by giving Tenant not less than sixty (60) days' notice of such termination and upon the expiration of the time fixed in such Notice, this Lease shall terminate and

all rights of Tenant under this Lease shall cease. In the event litigation is commenced with respect to any alleged default under this Lease, the prevailing party in such litigation shall receive, in addition to its damages incurred, such sum as the court shall determine as its reasonable attorneys' fees, and all costs and expenses incurred in connection therewith.

16.2    Certain Remedies. Landlord shall have all remedies and rights provided in law and equity as a result of an Event of Default or Tenant's other breach under this Lease including a landlord's lien and/or a landlord's statutory lien pursuant to State, Federal and/or any local law, statute or ordinance and a UCC security interest in all property subject to the landlord's lien for rent due or to become due under the Lease. Landlord is authorized to file UCC-1 Financing Statements to perfect such lien. Without limiting the foregoing, if an Event of Default occurs (and the event giving rise to such Event of Default has not been cured within the curative period relating thereto as set forth in paragraph 16.1 above) whether or not this Lease has been terminated, Tenant shall, to the extent permitted by law, if required by Landlord to do so, surrender to Landlord the Premises within sixty (60) days pursuant to the provisions of Section 16.1 and quit the same and Landlord may enter upon and repossess the Premises by reasonable force, summary proceedings, ejectment or otherwise, and may remove Tenant and all other persons and any and all personal property from the Premises subject to any requirements of law.

16.3    Damages. Neither (a) the termination of this Lease pursuant to Section 16.1, (b) the repossession of the Premises, (c) the failure of Landlord, notwithstanding reasonable good faith efforts, to relet the Premises, shall relieve Tenant of its liability and obligations hereunder, including, without limitation, the obligation to pay damages resulting from Tenant's breach, all of which shall survive any such termination, repossession or reletting. In the event of any such termination, Tenant shall forthwith pay to Landlord all rent due and payable with respect to the Premises to and including the date of such termination, and damages as hereinafter provided.

(a)    Landlord shall not be deemed to have terminated this Lease unless Landlord delivers written Notice to Tenant of such election. If Landlord voluntarily elects to terminate this Lease, then in addition to all remedies available to Landlord, Landlord may recover damages in an amount equal to the sum of:

(i)    the worth, at the time of the award, of the unpaid rent which had been earned at the time of termination,

(ii)    the worth, at the time of the award, of the amount by which the unpaid rent which would have been earned during the remainder of the term of the Lease after termination exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided, and

(iii)    any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom.

The "worth at the time of award" as used in clause (i) above will be computed by allowing interest on unpaid rent at ten percent (10%) from the date due. The "worth, at the time of the award," as used in clause (ii) above will be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award.

(b)    Without limiting Landlord's other remedies provided herein and provided by law, Landlord may continue the Lease in effect after Tenant's breach and abandonment and recover rent as it becomes due, provided that, in such event, Tenant has the right to sublet or assign subject only to reasonable conditions imposed by Landlord. Accordingly, without termination of Tenant's right to

8

possession of the Premises, Landlord may demand and recover each installment of rent and other sums payable by Tenant to Landlord under the Lease as the same becomes due and payable, which rent and other sums shall bear interest at ten percent (10%), from the date when due until paid, and Landlord may enforce, by action or otherwise, any other term or covenant of this Lease.

16.4    Application of Funds. Any payments received by Landlord under any of the provisions of this Lease during the existence or continuance of any Event of Default shall be applied to Tenant's obligations in the order which Landlord may determine unless otherwise prescribed by the laws of New Mexico.

17.    Attorney's Fees. In the case any action or proceeding should be brought for recovery of the Premises, or for any sum due hereunder, or because of any act which may arise out of the possession of the Premises, by either party, the prevailing party shall be entitled to all costs incurred in connection with such action, including a reasonable attorney's fee.

18.    Waiver. No failure of Landlord to enforce any term hereof shall be deemed to be a waiver.

19.    Notices. Any notice which either party may or is required to give, shall be given by mailing to Tenant at the Premises or Landlord at 2920 Stanford Dr., N.E., Suite C, Albuquerque, New Mexico 87107, or at such other places as may be designated by the parties from time to time.

20.    Heirs, Assigns, Successors. This Lease is binding upon and inures to the benefit of the heirs, assigns, and successors in interest to the parties.

21.    Option to Renew. Provided that Tenant is not in default in the performance of this Lease, Tenant shall have the option to renew the Lease for two (2) additional terms of sixty-months (60). The option shall be exercised by written notice given to the Landlord not less than ninety (90) days prior to the expiration of the Lease term. If notice is not given in the manner provided therein within the time specified, this option shall expire.

22.    Grant of Right of First Refusal and Purchase Option. If at any time during the term of this Lease Landlord elects to sell all or part of its right, title and interest in the Premises, Tenant shall have the right to purchase such interest at the same price and on the same terms as any bona fide offer of purchase made with respect thereto. Upon failure of Tenant to meet such bona fide offer within 30 days after notice thereof, Landlord shall be free to sell such interest in the Premises to a third person in accordance with the terms and conditions of the offer. Tenant shall have the option, at any time during the term of this Lease, to purchase the Premises from the Landlord or the Landlord's successor or assign in interest for the Option Price, (the "Option") in accordance with the terms set forth on the Sale Contract attached hereto as Exhibit "B". The "Option Price" shall be the fair market value of the building and real property, as determined by an appraisal conducted by an MAI appraiser ("FMV") retained by the Tenant, at the Tenant's sole cost and discretion. In making his/her determination of FMV the MAI Appraiser shall not consider the Premises current use as an ambulatory surgical center but rather as a single tenant commercial use building. If Landlord receives a bona fide offer from an unrelated third party in an arms-length transaction after Tenant exercises its option to purchase the Premises, the MAI appraisal shall take into consideration the offer in determining the FMV of the Premises. If Landlord objects to the Tenant's FMV it must do so in writing within 30 days of receipt of the Tenant's appraisal. In the event Landlord objects to the Tenant's appraised FMV within 30 days of receipt of the Tenant's appraisal, then Landlord may obtain its own MAI appraiser. If the FMV of the Landlord's appraisal is within five percent (5%) of the FMV as determined by Tenant's appraiser, then the parties shall proceed to close the transaction pursuant to Exhibit B at the Option Price,

9

which shall be the Greater of the FMV as determined by the Tenant's appraiser and Landlord's appraiser. If the FMV of the Landlord's appraisal is greater than five percent (5%) of FMV as determined by Tenant's appraiser, then Tenant may accept Landlord's FMV and the parties shall proceed to closing pursuant to the terms of Exhibit B. If Tenant objects to Landlord's appraised FMV then the Tenant's appraiser and the Landlord's appraiser shall choose a third MAI appraiser who shall examine the appraisals by Landlord's and Tenant's appraiser and determine the FMV from the two appraisals and said determination shall be final and binding on the parties hereto.

    23.    Expiration of Right of First Refusal. All rights granted by paragraph 22 are personal to Tenant and its assigns. Any attempt by Landlord to assign said rights shall be without effect and shall cause the immediate termination of all rights created by paragraph 22 without the requirement of any act by Landlord. The right of first refusal, the option to purchase and all rights and interests created hereby shall immediately expire and terminate upon the termination of this Lease without the requirement of any act on the part of either Tenant or Landlord. Upon request by Landlord, Tenant shall execute any document reasonably required by Landlord to evidence such termination.

    24.    Subordination. This Lease is and shall be subordinated to all existing and future liens and encumbrances against the Premises.

    25.    Estoppel Certificates.

    25.1    At any time and from time to time upon not less than thirty (30) days' Notice by Landlord, Tenant will furnish to Landlord an officer's certificate certifying, to the extent true, that this Lease is unmodified and in full force and effect (or that this Lease is in full force and effect as modified and setting forth the modifications) and the date to which the rent has been paid. Any such certificate furnished pursuant to this paragraph 25.1 may be relied upon by Landlord and any prospective purchaser, or lender of the Premises.

    25.2    At any time and from time to time upon not less than thirty (30) days' Notice by Tenant, Landlord will furnish to Tenant a certificate signed by a duly authorized representative or officer of Landlord certifying that this Lease is unmodified and in full force and effect (or that this Lease is in full force and effect as modified and setting forth the modifications) and the date to which the rent has been paid. Any such certificate furnished pursuant to this paragraph 25.2 may be relied upon by Tenant and any prospective subtenant, assignee, or lender of the Premises.

    26.    Entire Agreement. The foregoing constitutes the entire agreement between the parties and may be modified only in writing signed by both parties.

    IN WITNESS WHEREOF, the parties hereto have executed this Lease Agreement this 27th day of January, 2017 first set forth above.

TENANT:                                                   LANDLORD:

UNITED UROLOGY CENTERS,                   MV INDUSTRIES REAL
LLC                                                        ESTATE, LLC

By: _____                              By: _____
Its: _____                             Its: _____

10

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

## EXHIBIT B

## COMMERCIAL REAL ESTATE SALES CONTRACT

THIS COMMERCIAL REAL ESTATE SALES CONTRACT (this "Agreement"), as of _____, (the "Effective Date") is by and between UNITED UROLOGY CENTERS, LLC or its assignee or nominee (the "Purchaser"), and MV INDUSTRIES REAL ESTATE, LLC ("Seller").

### RECITALS

A.     Seller currently owns the fee simple title to certain real estate commonly known as 1720 Wyoming Blvd. N.E., Albuquerque, New Mexico, and legally described on Exhibit A attached hereto (the "Land").

B.     Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, the Property (as hereinafter defined) for the consideration, on the terms, and subject to the conditions hereinafter set forth herein.

### AGREEMENTS

NOW, THEREFORE, in consideration of the recitals and the mutual promises, covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.     Sale and Purchase. Subject to the terms and conditions of this Agreement and the above recitals which are by this reference incorporated herein, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller all of the following described property (collectively, "Property"):

i.     The Land and any and all rights, privileges, easements and appurtenances to the Land owned by Seller, including, without limitation, all mineral rights, easements, rights-of-way, gas and hydrocarbons, and other appurtenances, if any, used or connected with the beneficial use or enjoyment of the Land; and any and all right, title and interest of Seller, if any, in and to all streets, water courses or water bodies adjacent to, abutting or serving the Land.

ii     All buildings located upon the Land, and all other improvements, structures, fixtures, parking areas and other improvements of any kind or nature whatsoever now or hereafter located on the Land (collectively, "Building").

Seller agrees to sell, and Purchaser agrees to purchase, the Property, which shall be transferred

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

pursuant to a recordable Warranty or Trustee's deed and a bill of sale, subject only to taxes and assessments (whether general or special) not due as of the Closing Date (as hereinafter defined) and easements, building lines, covenants, conditions and restrictions of record.

**Section 2. Purchase Price; Earnest Money.**

(a) **Purchase Price.** Purchaser agrees to pay a total purchase price as determined pursuant to Section 22 of that certain Lease Agreement (the "**Lease Agreement**") by and between Purchaser and Seller (the "**Purchase Price**") for the Property (subject only to prorations specifically set forth herein). The Purchase Price shall be paid on the Closing Date (as hereinafter defined) by wire transfer, certified funds or title company check.

(b) **Earnest Money Deposit.** Unless otherwise agreed to in writing among the parties, upon execution of this Agreement, Purchaser shall deliver to the Title Company ("**Escrowee**") Fifteen Thousand Dollars ($15,000.00) in cash or certified check, as earnest money. (Said money, including any and all interest accrued thereon, is collectively, the "**Earnest Money**"). The Earnest Money shall be held by the Escrowee in escrow for the mutual benefit of Seller and Purchaser. The Earnest Money shall be applied toward the Purchase Price at Closing and any interest earned thereon shall be paid to Purchaser.

**Section 3. Closing.** Subject to the terms and conditions contained in this Agreement, the consummation of the transactions herein contemplated ("**Closing**") shall take place on the 15th day following the expiration of the due diligence inspection period as defined in section 5 hereinbelow, ("**Closing Date**"), or at an earlier or later date by mutual agreement between the parties. The transaction herein contemplated shall be closed through an escrow with the national Title Company of Purchaser's choosing ("**Title Company**") on the Closing Date, in accordance with the general provisions of the usual form of "New York Style" Deed and Money Escrow Agreement then in use by Title Company, with such special provisions inserted in the escrow agreement as may be required to conform with this Agreement ("**Escrow**"). Upon the creation of the Escrow, anything herein to the contrary notwithstanding, payment of the Purchase Price and delivery of the Deed (as hereinafter defined) and other documents to be delivered, shall be made through the Escrow. Seller and Purchaser (if required) shall execute gap undertakings in the form required by the Title Company in order to close by a "New York Style" closing. At closing, Seller shall pay for all state, county, and local property transfer taxes.

**Section 4. Possession.** Commencing immediately upon the Closing, Purchaser shall be entitled to possession of the Property. Seller shall remove all debris from the premises prior to closing.

**Section 5. Inspection; Financing; Environmental Assessment.**

A. On or before the Effective Date, Seller will deliver to Purchaser copies of all existing surveys, title insurance policies, environmental reports, and assessment notices, governmental notices, permits, service contracts, and agreements and other documents concerning the Property, if any, in the possession of Seller ("**Due Diligence**

12

Documents").

B.    Purchaser shall have until 5:00 p.m. on the thirty second (32nd[th]) day following the Effective Date ("**Due Diligence Completion Date**") to conduct a due diligence examination of all factors affecting the Property, including but not limited to the physical and environmental condition of the Property, and to satisfy itself, in its sole discretion, as to the acceptability thereof, and suitability of the Property for Purchaser's intended purposes, subject to the satisfaction of all of the conditions precedent hereinafter set forth ("**Due Diligence Inspection Period**").

If, prior to 5:00 p.m. on the Due Diligence Completion Date, the Purchaser determines, in its sole and absolute discretion, that the Property is unsatisfactory to the Purchaser, for any reason whatsoever, or for no reason, Purchaser shall have the right, upon written notice delivered to the Seller on or before the Due Diligence Completion Date, to terminate this Agreement ("**Termination Notice**"). In the event this Contract is so terminated, the Deposit, including any interest thereon, shall be returned to Purchaser and this Contract shall terminate, and neither party shall have any further rights or obligations to the other under this Contract, except as specifically set forth herein.

C.    Purchaser, its authorized agents, employees and representative shall have the right of access to the Property at all reasonable times subsequent to the Effective Date and subject to the rights of any tenant to: (a) inspect such Property; and (b) conduct all surveys, inspections and tests on the Property as Purchaser, its authorized agents, employees, representatives and professionals shall deem necessary or desirable, at its sole cost and expense, except as set forth herein to the contrary. The Purchaser hereby agrees to indemnify and hold the Seller harmless from and against: (i) any and all claims, actions, damages or expenses arising from Purchaser's test, borings, and/or inspections conducted on the Property prior to closing; (ii) any mechanic's liens filed against the Property resulting from the Purchaser's test, or inspections conducted prior to closing; and (iii) any negligence or willful acts by Purchaser, Purchaser's agents, representatives or employees. Purchaser further agrees to repair and restore any damage caused by Purchaser's inspection of the Property to its condition prior to the inspection.

D.    **"As Is".**    **Other than the representations and warranties contained in Section 12 herein below,** the land and improvements are being sold hereunder "as is". **Other than the representations and warranties contained in Section 12 herein below, Seller**

13

        makes no warranties in connection with this sale and ALL WARRANTIES OF EVERY KIND AND NATURE, EXPRESS OR IMPLIED other than those set forth herein, ARE EXPRESSLY EXCLUDED.

E  Purchaser shall have until 5:00 p.m. on the thirtieth (30th) day following the Effective Date to obtain a mortgage financing satisfactory to the Purchaser. If the Purchaser in good faith is unable to obtain mortgage financing, Purchaser shall have the right, upon written notice delivered to the Seller on or before the 30th day, to terminate this Agreement. In the event this Contract is so terminated, the Deposit, including any interest thereon, shall be returned to Purchaser and this Contract shall terminate, and neither party shall have any further rights or obligations to the other under this Contract, except as specifically set forth herein.

    **Section 6.**  **Survey.** No later than thirty (30) days after delivery to Purchaser of the Title Commitment, Seller at its expense shall deliver to Purchaser a minimum standard ALTA/ACSM survey ("**Survey**") for the Property certified to the Purchaser, Purchaser's lender as identified by Purchaser, if any, and the Title Company (a) sufficient to be used as a basis for deletion of the standard survey exception in the title insurance policy referred to in Section 11 and the issuance of extended coverage by the Title Company, (b) prepared by a surveyor licensed in New Mexico, (c) certifying the flood zone, if any, in which the Property is located, and (d) reflecting all easements.

    **Section 7.**  **Title Insurance.** Within twenty-one (21) days of the date hereof, Seller will, at Seller's expense, deliver to Purchaser a written commitment of the Title Company committing to insure Purchaser's fee simple title to the Property under the current ALTA form policy in a nominal amount. On the Closing Date, Seller shall, at Seller's expense, cause the Title Company to issue an ALTA Owner's Extended Coverage Title Insurance Policy together with any endorsements that Purchaser may require or irrevocable commitment to issue same covering the Property in the amount of the Purchase Price which policy or irrevocable commitment shall (a) contain only the Permitted Exceptions, and (b) contain extended coverage over all general exceptions.

    **Section 8.**  **Title Defects.** If the title commitment or the Survey discloses either unpermitted exceptions ("**Unpermitted Exceptions**") or survey matters not reasonably acceptable to Purchaser ("**Survey Defects**"), Seller shall have fifteen (15) days from the date of delivery thereof to have the Unpermitted Exceptions removed from the commitment or to correct such Survey Defects or to have the Title Insurer commit to insure against loss or damage that may be occasioned by such Unpermitted Exceptions or Survey Defects, and, in such event, the Closing Date shall be changed to be twenty (20) days after the delivery of the commitment or the Closing Date set forth in Section 3, whichever is later. If Seller fails to have the Unpermitted Exceptions removed or correct any Survey Defects, or in the alternative, to obtain the commitment for title insurance specified above as to such Unpermitted Exceptions or Survey Defects within the

14

specified time, the Purchaser may terminate this contract or elect to take title as it then is with the right to deduct from the Purchase Price liens or encumbrances of a definite or ascertainable amount. If the Purchaser does not so elect, this Agreement shall become null and void without further action of the parties hereto and the parties shall immediately direct that the Earnest Money and all interest thereon be released to Purchaser. In any event, Seller shall have the obligation to remove any mortgage or lien of an ascertainable amount from the title commitment, and may use the proceeds at Closing to accomplish same.

### Section 9.    Documents to be Delivered at Closing.

(a)    **Seller's Closing Documents.** Seller shall deliver to the Escrow, on or before the Closing Date, the following documents, all of which shall be in customary form and otherwise be subject to Purchaser's prior review and approval as to form, scope and substance (which approval shall not be unreasonably withheld), the delivery of all of which shall be a specific condition to Closing:

  (i)    Trustee's or Warranty Deed;

  (ii)    A pro forma Title Policy;

  (iii)    A bill of sale in a form attached hereto as Exhibit B;

  (iv)    A non-foreign certificate in accordance with the provisions of Section 19 hereof;

  (v)    ALTA statement;

  (vi)    An Affidavit of Title;

  (vii)    Personal "GAP" undertaking of Seller;

  (viii)    Such proof of Seller's authority and authorization to enter into this Agreement and perform Seller's obligations under this Agreement as may be reasonably required by the Title Company, including corporate resolutions and incumbency certificates; and

  (ix)    Such other documents as Purchaser and the Title Company may reasonably request to enable Purchaser to consummate the transaction contemplated by this Agreement.

(b)    **Purchaser's Closing Documents.** Purchaser shall deliver to the Escrowee, on or before the Closing Date, the following monies and documents, the delivery of all of which shall constitute a specific condition to Closing:

  (i)    The Purchase Price, plus or minus Purchaser's share of closing costs and prorations pursuant to the terms of this Agreement; and

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

(ii)    Such other documents as Seller may reasonably request to enable Seller to consummate the transaction contemplated by this Agreement.

### Section 10.    Tax Agreements Prorations.

Seller shall pay all taxes and current installments of assessments on the Property the date when due but in any event on or prior to the Closing Date. Unpaid taxes on the Property for the then current tax year and later years shall be prorated as of the Closing Date based upon one hundred and ten percent (110%) of the most recent ascertainable tax bill.

### Section 11.    Representations and Warranties.

(a).    Seller represents and warrants, other than what may be disclosed in an Environmental Audit, and then only to the best of Seller's knowledge, that there are no above ground or underground storage tanks, or Hazardous Materials on or beneath the surface of the Property and that the Property contains no Hazardous Materials Contamination and that during Seller's ownership of the Property, no Hazardous Materials were manufactured or stored on the Property during Seller's ownership.

(b).    To induce Purchaser to execute, deliver and perform this Contract and without regard to any independent investigations made by Purchaser, Seller hereby represents and warrants to Purchaser which representations shall not be merged into any deed but shall survive the closing for a period of one (1) year that:

*Organization and Authority*. Seller is duly organized or formed, validly existing and in good standing under the laws of its state of formation, and is qualified as a foreign limited liability company to do business in any jurisdiction where such qualification is required. Seller has all requisite limited liability company power and authority to own and operate the Property, to execute, deliver and perform its obligations under this Agreement, and to carry out the transaction. The Person who has executed this Agreement on behalf of Seller has been duly authorized to do so.

*Enforceability of Documents*. Upon execution by Seller, this Agreement shall constitute legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium, or other similar laws relating to or affecting the rights of creditors generally, or by general equitable principles.

*No Other Agreements and Options*. Except for this Agreement and the Lease Agreement, none of Seller or the Property is subject to any commitment, obligation, or agreement, including, without limitation, any right of first refusal, option to purchase or lease granted to a third party, which could or would (i) prevent Seller from completing, or impair Seller's ability to complete, the sale of the Property under this Agreement, or (ii) bind Purchaser subsequent to consummation of the transaction. Except for the Lease Agreement, there is no lease in place, nor has there been any lease in place within the last twelve (12) months of the Effective Date, related to all or any part of any Property, even if any such lease will be terminated upon Closing.

16

*No Violations.* The authorization, execution, delivery and performance of this Agreement will not (i) violate any provisions of the certificate of formation or other charter documents of Seller, (ii) result in a violation of or a conflict with, or constitute a default (or an event which, with or without due notice or lapse of time, or both, would constitute a default) under any other document, instrument or agreement to which Seller is a party or by which Seller, the Property or any of the property of Seller is subject or bound, (iii) result in the creation or imposition of any Lien, restriction, charge or limitation of any kind, upon Seller or the Property, or (iv) violate any law, statute, regulation, rule, ordinance, code, rule or order of any court or Governmental Authority applicable to Seller or the Property.

*Compliance.* Seller has not received any notification that the Property is in violation of any of the following: (i) all applicable statutes, regulations, rules, ordinances, codes, licenses, permits, orders and approvals of each Governmental Authority having jurisdiction over the Property, including, without limitation, all health, building, fire, safety and other codes, ordinances and requirements, the Americans With Disabilities Act of 1990, and all policies or rules of common law, in each case, as amended, and any judicial or administrative interpretation thereof, including any judicial order, consent, decree or judgment applicable to the Property (collectively, the "Legal Requirements"), (ii) all restrictions, covenants and encumbrances of record with respect to the Property, and (iii) all agreements, contracts, insurance policies (including, without limitation, to the extent necessary to prevent cancellation thereof and to insure full payment of any claims made under such policies), agreements and conditions applicable to the Property or the ownership, operation, use or possession thereof.

*Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws.* Seller is not currently identified on the OFAC List, and is not a Person with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States.

*Litigation.* To Seller's knowledge there is no legal, administrative, arbitration or other proceeding, claim or action of any nature or investigation pending, involving or threatened against, Seller, or the Property before any Governmental Authority, except as has been disclosed in writing by Seller, which in any way adversely affects or may adversely affect the Property, the business performed and to be performed on the Property, the condition, the ability of any of the Seller to perform under this Agreement, or which questions or challenges the Seller's participation in the transaction contemplated by this Agreement.

*Mechanics' Liens.* Seller shall be responsible for any and all claims for mechanics' liens and accounts payable that have arisen or may subsequently arise due to agreements entered into by Seller for and/or any work performed on, or materials supplied to the Property prior and subsequent to the Closing Date, and Seller shall and does hereby agree to defend, indemnify and forever hold Purchaser and Purchaser's designees harmless from and against any and all such mechanics' lien claims, accounts payable or other commitments relating to the Property.

*Satisfaction of Conditions Precedent.* From the Effective Date through the Closing Date, Seller shall use commercially reasonable efforts to satisfy all of its conditions set forth in this Agreement on or prior to the Closing Date.

*No Bankruptcy Petition.* Seller hereby agrees that it shall not institute against, or join any other Person in instituting against, Purchaser, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or any other proceeding under any federal or state bankruptcy or similar law. The provisions of this Section shall survive the Closing or termination of this Agreement. Notwithstanding the foregoing, the provisions of this Section shall in no way limit any other rights Seller may have with respect to this Agreement, either at law or in equity.

*State Bulk Sales Statutes.* Seller agrees to indemnify, defend and hold Purchaser harmless from and against any and all losses, costs, damages, expenses (including without limitation, court costs and reasonable attorney's fees) and liabilities which may be sustained or incurred by Purchaser, and/or any and all claims, demands, suits, proceedings and causes of action which may be brought or raised against Seller or Purchaser, as a result of or arising from (i) any claim that Purchaser has any liability or obligations under any bulk sales statutes promulgated by any Governmental Authority ("Bulk Sales Statutes") (including without limitation, any tax obligations or liabilities (or interest or penalties connected therewith) of Seller) by reason of the transactions provided for herein; or (ii) the failure of Purchaser to withhold any of Seller's unpaid tax obligations, liabilities, interest or penalties thereon from the Purchase Price or otherwise as required under any Bulk Sales Statutes.

Section 12.    Fees and Commissions. Seller and Purchaser represent and warrant to each other that they have not engaged the services of any broker in connection with the sale and purchase contemplated by this Agreement. Purchaser and Seller hereby mutually agree to indemnify and hold each other harmless for any claim (including reasonable expenses incurred in defending such claim) made by any other broker or sales agent or any similar party hired by the other party in connection with this transaction and not disclosed herein.

Section 13.    Closing Costs. All costs and expenses in connection with the transaction contemplated by this Agreement shall be borne by Purchaser and Seller in the manner in which such cost and expenses are customarily allocated between the parties at closings of real property similar to the Property in the Albuquerque, New Mexico area. Except as specifically provided elsewhere in this Agreement, each party hereto shall pay its own attorneys' fees incurred with respect to the preparation and negotiation of this Agreement and the Closing of the transaction contemplated hereby.

Section 14.    Performance. Time is of the essence of this Agreement. Purchaser or Seller shall pay all reasonable attorney's fees and costs incurred by the prevailing party in enforcing the terms and provisions of this Agreement, including forfeiture or specific performance, in defending any proceeding to which Purchaser or Seller is/are made a party as a result of the acts or omissions of the other party.

Section 15.    Risk of Loss. In the event that, prior to Closing, the Property shall be destroyed by fire or other casualty then at the election of Purchaser, (a) this Agreement may be canceled or (b) Purchaser may consummate this Agreement and receive such insurance proceeds as are paid on the claim of loss. If Purchaser has not been so notified by Seller within thirty (30) days subsequent to the occurrence of such damage or destruction, or by the Closing Date,

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

whichever occurs first, Purchaser may, at its option, terminate this Agreement and the parties shall immediately direct the release of the Earnest Money and all interest thereon to Purchaser.

**Section 16.**   **1445 Compliance.** Seller and Purchaser agree that if any Seller is a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code, the Purchaser shall withhold or deduct from the sales proceeds a tax equal to ten percent (10%) of the amount realized. This provision shall not apply if Seller furnishes to Purchaser an affidavit stating under penalty of perjury, each Seller's U.S. Taxpayer I.D. number and that each Seller is not a "foreign person" as defined by the Internal Revenue Code.

**Section 17.**   **Claims for Indemnity.** All claims for indemnity under this Agreement shall be brought within Twelve (12) months after closing. All of Sellers' obligations hereunder to indemnify Purchaser shall terminate Twelve (12) month after closing.

**Section 18.**   **Miscellaneous.**

(a)   **Successors and Assigns.** This Agreement will bind and inure to the benefit of the respective successors and assigns of the parties hereto, whether so expressed or not.

(b)   **Headings.**   The descriptive headings of this Agreement are inserted for convenience of reference only and do not constitute a part of this Agreement.

(c)   **Notices.** Any notices required, permitted or desired to be given hereunder shall be delivered personally, sent by nationally recognized overnight courier or mailed, registered mail, return receipt requested, or by facsimile to the following addresses and facsimile numbers, and shall be deemed to have been received on the day of personal delivery, one (1) business day after deposit with a nationally recognized overnight courier  three (3) business days after deposit in the mail or (4) the date the notice was faxed:

If to Purchaser, to:

> Mike Vigil
> MV Industries, LLC
> 2920 Stanford Dr. N.E.
> Suite C
> Albuquerque, NM 87107

If to Seller, to:

> F. Bruce Cohen, Esq.
> UNITED UROLOGY CENTERS, LLC
> 10600 W. Higgins Road, Suite 301
> Rosemont, IL 60018

With a copy to:

> Wiezer & Sheldon LLC
> Attention: Elliot S. Wiezer
> 500 Skokie Blvd., Ste. 325

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

Northbrook, Illinois 60062
Fax:   (847) 849-4852
Phone: (847) 849-4850

or to such other address or fax number as any party may specify in a written notice given to the other parties hereto.  Notice may also be given by facsimile transmission to the above-referenced fax numbers provided that the transmission occurs during business hours of 9:00 a.m. and 5:00 p.m. on a normal business day.

(d)   **Governing Law**.   All questions concerning the construction, validity and interpretation of this Agreement and the Exhibits hereto shall be governed by the internal law, and not the law of conflicts of, the State of New Mexico applicable to contracts made and wholly to be performed in such state.

(e)   **Exhibits.**  All Exhibits attached hereto are an integral part of this agreement.

(f)   **Final Agreement.**  This Agreement, together with those documents expressly referred to herein, constitute the final agreement of the parties concerning the matters referred to herein, and supersede all prior agreements and understandings.

(g)   **Execution in Counterparts.**  This Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute one instrument.

(h)   **Waiver,**  At any time prior to the Closing Date any party hereto may extend the time for the performance of or waive compliance with any of the obligations or other acts of any other party contained herein or waive any inaccuracies in the representations or warranties of the other party contained herein or in any document delivered pursuant hereto.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby.  Except as otherwise expressly provided herein, the provisions of this Agreement may be amended only by the written agreement of the parties hereto.  Any waiver, consent or approval of any kind or character on the part of either party hereto with respect to any provisions or conditions of this Agreement must be made in writing and shall be effective only to the extent specifically set forth in such instrument.

(i)   **Fees and Expenses.**  Except as otherwise expressly provided herein, each party will bear all of its own expenses in connection with the preparation, execution and negotiation of this Agreement and the transactions contemplation hereby.

(j)   **Purchaser's Right to Assign**.  Purchaser may, upon prior written notice to Seller not less than five (5) days prior to Closing, assign this Agreement, without the requirement of any consent by Seller.  Upon assignment, all rights granted under this Agreement to purchaser shall inure to the benefit of and be exercisable by such assignee except that said assignment shall not release Purchaser from its obligations contained in this Agreement.

(k)   **Offer and Acceptance**.  Delivery by Seller to Purchaser of two (2) duplicate

20

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

originals of this Agreement executed by Purchaser shall constitute an offer to sell the Property upon the terms and conditions herein set forth which shall be effective for a period of five (5) days following the time of such delivery. If Purchaser fails to deliver two (2) fully executed originals of this Agreement without modification to Seller prior to expiration of such five (5) day period, then at Seller's sole option, said offer may be revoked and rescinded in its entirety at any time thereafter, and upon such revocation and rescission, said offer and this Agreement shall have no further force or effect. Any proposed modification to this Agreement shall constitute a counter-offer by Purchaser to Seller, and no contract will exist between the parties unless and until Seller consents in writing to the counter-offer.

(l)     **Exchange Provisions.** Both Purhaser and Seller reserve the right to assign this Agreement to a qualified intermediary within the meaning of Section 1031 of the Internal Revenue Code of 1986, as amended and Treas. Reg § 1.1031(k)-1(g), for the purpose of completing a tax-deferred exchange (or reverse exchange) under said Section 1031. The assigning party shall bear all expenses associated with the use of the qualified intermediary as necessary to qualify this transaction as a tax-deferred exchange, and shall protect, reimburse, indemnify and hold harmless the other party from and against any and all additional costs, expenses and liabilities which the other party may incur as a result of assignor's use of the qualified intermediary with respect to such tax-deferred exchange, excluding normal and customary attorney's fees incurred by the non-assigning party in closing the transaction. Upon assignor's request, the other party shall execute such documents as may be reasonably required to effect this tax-deferred exchange.

(Signature Page to Follow)

IN WITNESS WHEREOF, the parties hereto have executed this Commercial Real Estate Sales Agreement as of the date first set forth above.

(SIGNATURE PAGE FOLLOWS)

SELLER:
MV INDUSTRIES REAL ESTATE, LLC

BY:

ITS: Managing Marky

PURCHASER:
UNITED UROLOGY CENTERS, LLC

BY:

ITS:

22

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

EXHIBIT A
LEGAL DESCRIPTION

1720 WYOMING BLVD NE, ALBUQUERQUE, NEW MEXICO

**TR A-4 Blk 20 Dale J Bellamah's  Bellehaven Summary
EING A REPL of TRS A-4 and A-5) Cont. .857**

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

EXHIBIT B
BILL OF SALE

(To be attached)

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

## EXHIBIT C

## LEGAL DESCRIPTION

Tract A-4A in Block numbered Twenty (20) of Dale J. Bellamah's Bellehaven, Bernalillo County, New Mexico, being a replat of Tracts A-4 and A-5, Block 20 of said Addition, as the same is shown and designated on the summary plat of said addition, filed in the Office of the County Clerk of Bernalillo County, New Mexico on December 22, 1983, in Plat Book C22, page 175.

C-1

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

## EXHIBIT D

### FORM OF COMMENCEMENT DATE MEMORANDUM

### COMMENCEMENT DATE MEMORANDUM

This COMMENCEMENT DATE MEMORANDUM (this "Memorandum") dated _____, is made between UNITED UROLOGY CENTERS, LLC, a Delaware limited liability company ("Sublandlord"), and DAVITA MEDICAL GROUP NEW MEXICO, LLC, a Delaware limited liability company ("Subtenant"), with respect to the Sublease Agreement dated _____ (the "Sublease"), in which Sublandlord subleased to Subtenant and Subtenant subleased from Sublandlord space located at _____ (the "Subleased Premises").

Sublandlord and Subtenant acknowledge as follows:

(1)    Sublandlord delivered possession of the Subleased Premises to Subtenant on _____ (the "Possession Date").

(2)    The Term commenced on _____ (the "Commencement Date").

(3)    The Term will expire on _____ (the "Expiration Date").

(4)    The first Sublease Year will end on _____, and each subsequent Sublease Year will end on _____.

(5)    Subtenant shall commence payment of Rent on _____.

(6)    Rent shall be paid as follows:

| Sublease Term: | Rent PSF | Base Rent | Additional Payment* | Total Monthly Rent | Total Annual Rent |
|---|---|---|---|---|---|
| October 1, 2019 through January 31, 2020: | $12.68 | $15,000.00 | $0.00 | $15,000.00 | $180,000.00 |
| February 1, 2020 through September 30, 2020 | $14.38 | $15,000.00 | $2,000.00 | $17,000.00 | $204,000.00 |
| October 1, 2020 through September 30, 2021: | $14.76 | $15,450.00 | $2,000.00 | $17,450.00 | $209,400.00 |
| October 1, 2021 through January 31, 2022: | $15.15 | $15,913.50 | $2,000.00 | $17,913.50 | $190,962.00 |

*The chart above includes, under the column labeled "Additional Payment", the amounts due by Tenant pursuant to Section 2(c) of the Lease.

D-1

Albuquerque, NM (1720 Wyoming NE) (United Urology Centers LLC)
48196323;11

Capitalized terms not otherwise defined in this Memorandum have the same meaning set forth in the Sublease.

Sublandlord and Subtenant have executed this Memorandum as of the last date of execution.

**SUBLANDLORD:**                                       **SUBTENANT:**

UNITED UROLOGY CENTERS, LLC,                           DAVITA MEDICAL GROUP NEW MEXICO,
a Delaware limited liability company                   LLC, a Delaware limited liability company

By: _____                   By: _____

Name: _____                 Name: _____

Title: _____                Title: _____

Date: _____                 Date: _____

D-2

DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

## EXHIBIT E

### MAINTENANCE OBLIGATIONS

### LANDLORD OBLIGATIONS

- making roof repairs and structural foundations
- keeping private roadways, sidewalks, foundations, roofs, landscaping, driveways, all structural systems of the Premises and curb appurtenant in good order and repair and making necessary and appropriate repair thereto of every kind and nature
- making any repairs required as a result of Landlord's negligence or damage to the Premises

### SUBTENANT OBLIGATIONS

- maintaining interior premises in good and safe condition, and plate glass, electrical wiring, plumbing, and heating installations, and any other systems or equipment upon the Premises in good condition as received normal wear and tear excepted ("Tenant Maintenance Obligations")
- making all repairs required for Tenant's Maintenance Obligations, excepting roof repairs and structural foundations
- paying utility charges, including sewer, water, gas, electricity, and telephone services

Albuquerque, NM (1720 Wyoming NE) (United Urology Centers LLC)
48196323;11

Case 1:21-cv-00011-MV-KK   Document 1   Filed 01/05/21   Page 73 of 100
DocuSign Envelope ID: 1FCD8860-DA65-4AA2-B752-D4E143212330

## EXHIBIT F

## SITE PLAN
### *Parking*



D-4

Albuquerque, NM (1720 Wyoming NE) (United Urology Centers LLC)
48196323;11



## Certificate Of Completion

Envelope Id: 1FCD8860DA654AA2B752D4E143212330          Status: Completed
Subject: Please DocuSign: Albuquerque, NM (1720 Wyoming NE) - Sublease (United Urology Centers) Executio...
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 60 | Signatures: 4 | Envelope Originator: |
| Certificate Pages: 2 | Initials: 0 | Joni Smith |
| AutoNav: Enabled | | 495 N Keller Rd Ste 300 |
| EnvelopeId Stamping: Enabled | | Maitland, FL  32751-8656 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | joni.smith@akerman.com |
| | | IP Address: 104.129.200.80 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Joni Smith | Location: DocuSign |
|     5/10/2019 12:13:59 PM |     joni.smith@akerman.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Sumaya  Vanderhorst<br>sumaya.vanderhorst@davitamedicalgroup.com<br>VP, Associate General Counsel<br>Security Level: Email, Account Authentication<br>(None) | DocuSigned by:<br>*Sumaya Vanderhorst*<br>0FA6756827B54F2...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 216.145.124.132 | Sent: 5/10/2019 12:19:18 PM<br>Viewed: 5/10/2019 12:29:01 PM<br>Signed: 5/10/2019 12:29:32 PM |
| **Electronic Record and Signature Disclosure:**<br>  Not Offered via DocuSign | | |
| Jason Schulz<br>jason.schulz@davita.com<br>CFO<br>Security Level: Email, Account Authentication<br>(None) | DocuSigned by:<br>*Jason Schulz*<br>E2437C24D59B489...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 216.145.124.132 | Sent: 5/10/2019 12:29:33 PM<br>Viewed: 5/10/2019 12:38:00 PM<br>Signed: 5/10/2019 12:38:13 PM |
| **Electronic Record and Signature Disclosure:**<br>  Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/10/2019 12:29:33 PM |
| Certified Delivered | Security Checked | 5/10/2019 12:38:01 PM |
| Signing Complete | Security Checked | 5/10/2019 12:38:13 PM |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Completed | Security Checked | 5/10/2019 12:38:13 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

# akerman

Allison Nelson

Akerman LLP
1900 16th Street
Suite 1700
Denver, CO 80202

D: 303 640 2504
T: 303 260 7712
F: 303 260 7714
allison.nelson@akerman.com

June 25, 2019

**VIA FED EX**

c/o HealthTronics, Inc.
9825 Spectrum Drive
Building 3
Austin, TX 78717
Attn: Legal Department

> **Re:   That certain Sublease Agreement ("Sublease") between United Urology Centers, LLC ("Sublandlord") and OptumCare New Mexico, LLC, formerly known as DaVita Medical Group New Mexico, LLC ("Subtenant") for the building ("Building") located at 1720 Wyoming NE, Albuquerque, NM 87112**

Dear Legal Department:

We represent Subtenant in the above referenced Sublease. Due to the theft and vandalism at the Building, Subtenant is unable to obtain the licenses, permits, and accreditations from the applicable governmental authorities, to be licensed and operate as an ambulatory/outpatient surgical center by June 25, 2019. This letter serves as Subtenant's Early Termination Notice (as defined in the Sublease) pursuant to Section 3(a). The Sublease will terminate at 11:59 p.m. on June 30, 2019.

If you have any questions, please contact me at 303-640-2504 or allison.nelson@akerman.com.

Sincerely,

Allison Nelson

cc:   Sumaya Vanderhorst (via email: sumaya.vanderhorst@davitamedicalgroup.com)
Larry Jones (via email: larry.jones@healthcarepartners.com)
Matt Ciriello (via email: matthew.ciriello@davitamedicalgroup.com)
Elliot Wiczer (via email: ewiczer@wsjlawfirm.com)
Clint Davis (via email: clint.davis@healthtronics.com)

**Exhibit 2**

akerman

Allison Nelson

Akerman LLP
1900 16th Street
Suite 1700
Denver, CO 80202

D: 303 640 2504
T: 303 260 7712
F: 303 260 7714
allison.nelson@akerman.com

August 2, 2019

**VIA FIRST CLASS MAIL AND EMAIL:**
**hbohnhoff@rodey.com**

Henry M. Bohnhoff
Rodey Dickason, Sloan, Akin & Robb P.A.
201 Third Street NW
Suite 2200
Albuquerque, New Mexico 87102

Re:    **Sublease Agreement ("Sublease") between United Urology Centers, LLC ("Sublandlord") and DaVita Medical Group ("Subtenant") for the building ("Building") located at 1720 Wyoming NE, Albuquerque, NM 87112 (the "Property")**

Dear Mr. Bohnhoff:

We write in response to your July 17, 2019 letter and July 29, 2019 e-mail. This will confirm that Subtenant properly exercised its right to terminate the Sublease effective June 30, 2019, pursuant to Section 3(a) of the Sublease, which states, in pertinent part:

Subtenant shall diligently pursue obtaining the Licenses. If, by no fault of Subtenant, Subtenant is unable to obtain the Licenses by June 25, 2019, then Subtenant may terminate this Sublease by providing Sublandlord written notice of the same (such notice, an "Early Termination Notice). Such termination shall be effective five (5) calendar days following such notice and thereafter neither party shall have any further rights or remedies under the Sublease and both parties shall be relieved of any further obligations under the Sublease after the date of such termination, except those that expressly survive, or by their nature survive, such termination.

There is no dispute that Subtenant was unable to obtain the Licenses (as defined in the Lease) by June 25, 2019, nor is there any dispute that Subtenant properly provided the Early Termination Notice. Thus, Subtenant unequivocally terminated the Sublease in accordance with Section 3(a) thereof on June 30, 2019.

49493097:4

**Exhibit 3**

Your July 17th letter sent in response to the Early Termination Notice focuses solely on the copper theft and vandalism (the "Theft"). However, irrespective of the Theft, Subtenant's right to terminate the Sublease was in full force and effect because Subtenant was unable to obtain the Licenses by June 25, 2019 as a result of a whole host of additional issues that were completely unrelated to the Theft. As an initial matter, Subtenant made diligent efforts to pursue the necessary licenses and permits from applicable government authorities for licensure and operation as an ambulatory surgery center (the "ASC Licensure"), but numerous issues aside from the Theft, which were entirely outside of the control of Subtenant, caused Subtenant to be unable to obtain the Licenses by the contractually agreed upon deadline. The following is a timeline of Subtenant's efforts as well as the impediments to obtaining ASC Licensure:

- There were numerous code compliance issues with the Building aside from the damage due to the Theft.

- Within days of receiving the keys, on June 3, 2019, Subtenant visited the Property to evaluate what remedial measures were necessary to prepare the Building for licensure and operational status.

- That same day, local electrical contractors and inspectors visited the Property to prepare a scope of work and estimates of costs for the electrical repairs and provide an opinion on code compliance.

- The electrical contractors and inspectors reported that, notwithstanding the Theft, the existing configuration was not to code and additional work was necessary to comply with local building regulations. The electrical contractor estimated the electrical work alone would take *__four to six weeks to complete__*.

- Subtenant also engaged a third party architectural firm and corporate ASC expert to perform a Life Safety and ADA code compliance evaluation on June 6, 2019. This analysis concluded that, notwithstanding the damage from the Theft, the Building would not pass compliance and required substantial renovations in order to obtain the applicable ASC Licensure. The architectural firm estimated that the renovations necessary to obtain ASC Licensure would take *__six to eight months to complete__*.

- To further confirm this estimate, on June 10, 2019, Subtenant engaged an architectural consultant to vet the Building with the New Mexico Department of Health. The New Mexico Department of Health determined that, notwithstanding the damage from the Theft, the Building required upgrades to current code as part of transferring Subtenant's licenses to the Building.

Based on the above scope of work and timeline estimates, regardless of the damage related to the Theft, Subtenant was not able to complete the renovations necessary to obtain the ASC Licensure by June 25, 2019. Pursuant to Section 3(a) of the Sublease, Subtenant had the unilateral right to terminate the Lease under these circumstances. Subtenant properly exercised its right to

49493097;4

terminate the Sublease via its June 25, 2019 letter, and the Sublease terminated effective June 30, 2019.  Subtenant physically delivered keys to the Building to your agent on June 26, 2019.

As of June 30, 2019, Subtenant had no possessory or leasehold interest in the Property and, therefore, Sublandlord was responsible for securing Property.  Any damage to the Property thereafter is the sole responsibility of Sublandlord.

Subtenant hereby reserves all other rights and remedies available to Subtenant pursuant to applicable law and the Sublease.  Furthermore, this letter shall not be construed as a waiver of any of the Subtenant's rights or remedies.

Sincerely,

**AKERMAN LLP**

Allison Nelson

49493097;4

**4-206. Summons.**

[For use with District Court Civil Rule 1-004 NMRA]

<table>
<tr><td colspan="2" align="center"><b>SUMMONS</b></td></tr>
<tr>
<td>District Court: <u>Second Judicial</u><br><u>Bernalillo</u>    County, New Mexico<br>Court Address: 400 Lomas Blvd. NW<br>        Albuquerque, NM 87102<br>Court Telephone Number.: (505) 841-7451</td>
<td>Case Number:   D-202-CV-2020-06590<br><br><br>Judge: Benjamin Chavez</td>
</tr>
<tr>
<td>Plaintiff(s): United Urology Centers, LLC<br>v.        OptumCare New Mexico, LLC<br>Defendant(s): f/k/a DaVita Medical Group New Mexico, LLC</td>
<td>Defendant<br>Name: OptumCare New Mexico, LLC f/k/a DaVita Medical Group New Mexico, LLC<br>Address: c/o CT Corporation System, 205 S. Coronado Avenue, Espanola, NM 87532</td>
</tr>
</table>

<b>TO THE ABOVE NAMED DEFENDANT(S):</b> Take notice that

      1.     A lawsuit has been filed against you. A copy of the lawsuit is attached. The Court issued this Summons.

      2.     You must respond to this lawsuit in writing. You must file your written response with the Court no later than thirty (30) days from the date you are served with this Summons. (The date you are considered served with the Summons is determined by Rule 1-004 NMRA) The Court's address is listed above.

      3.     You must file (in person or by mail) your written response with the Court.  When you file your response, you must give or mail a copy to the person who signed the lawsuit.

      4.     If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.

      5.     You are entitled to a jury trial in most types of lawsuits. To ask for a jury trial, you must request one in writing and pay a jury fee.

      6.     If you need an interpreter, you must ask for one in writing.

      7.     You may wish to consult a lawyer. You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6227; or 1-505-797-6066.

      Dated at _____, New Mexico, this _____ day of 12/3/2020 , 20___.

SECOND JUDICIAL DISTRICT COURT
CLERK OF THE COURT

By: _____  –
      Deputy Clerk

Attorney for Plaintiff or
Plaintiff pro se

Name: Rodey, Dickason, Sloan, Akin & Robb, P.A.
Henry M. Bohnhoff
Address: P.O. Box 1888, Albuquerque, NM 87103
Telephone No.: (505) 765-5900
Fax No.: (505) 768-7395
Email Address: hbohnhoff@rodey.com

THIS SUMMONS IS ISSUED PURSUANT TO RULE 1-004 NMRA OF THE NEW MEXICO RULES OF CIVIL PROCEDURE FOR DISTRICT COURTS.

## RETURN[1]

STATE OF NEW MEXICO          )
                             )ss
COUNTY OF _____        )

I, being duly sworn, on oath, state that I am over the age of eighteen (18) years and not a party to this lawsuit, and that I served this summons in _____ county on the _____ day of _____, _____, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

**(check one box and fill in appropriate blanks)**

[ ]     to the defendant _____ (*used when defendant accepts a copy of summons and complaint or refuses to accept the summons and complaint*)

[ ]     to the defendant by [mail] [courier service] as provided by Rule 1-004 NMRA (*used when service is by mail or commercial courier service*).

After attempting to serve the summons and complaint on the defendant by personal service or by mail or commercial courier service, by delivering a copy of this summons, with a copy of complaint attached, in the following manner:

[ ]     to _____, a person over fifteen (15) years of age and residing at the usual place of abode of defendant _____, (*used when the defendant is not presently at place of abode*) and by mailing by first class mail to the defendant at _____ (*insert defendant's last known mailing address*) a copy of the summons and complaint.

[ ]     to _____, the person apparently in charge at the actual place of business or employment of the defendant and by mailing by first class mail to the defendant at _____ (*insert defendant's business address*) and by mailing the summons and complaint by first class mail to the defendant at _____ (*insert defendant's last known mailing address*).

[ ]     to _____, an agent authorized to receive service of process for

defendant _____.

[ ]     to _____, [parent] [guardian] [custodian] [conservator] [guardian ad litem] of defendant _____ (*used when defendant is a minor or an incompetent person*).

[ ]     to _____ (*name of person*), _____, (*title of person authorized to receive service. Use this alternative when the defendant is a corporation or an association subject to a suit under a common name, a land grant board of trustees, the State of New Mexico or any political subdivision*).

Fees:      _____

_____
Signature of person making service

_____
Title (*if any*)

Subscribed and sworn to before me this _____ day of _____, _____.[2]

_____
Judge, notary or other officer
authorized to administer oaths

_____
Official title

## USE NOTE

     1.     Unless otherwise ordered by the court, this return is not to be filed with the court prior to service of the summons and complaint on the defendant.

     2.     If service is made by the sheriff or a deputy sheriff of a New Mexico county, the signature of the sheriff or deputy sheriff need not be notarized.

[Adopted effective August 1, 1988; as amended by Supreme Court Order 05-8300-01, effective March 1, 2005; by Supreme Court Order 07-8300-16, effective August 1, 2007;  by Supreme Court Order No. 12-8300-026, effective for all cases filed or pending on or after January 7, 2013; as amended by Supreme Court Order No. 13-8300-022, effective for all cases pending or filed on or after December 31, 2013; as amended by Supreme Court Order No. 14-8300-017, effective for all cases pending or filed on or after December 31, 2014.]

**FILED**
**2ND JUDICIAL DISTRICT COURT**
**Bernalillo County**
**12/3/2020 11:34 AM**
**CLERK OF THE COURT**
**Luke Tessman**

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT

United Urology Centers, LLC,
a Delaware limited liability company,
Plaintiff,

vs.                                    Case No. _____ D-202-CV-2020-06590

OptumCare New Mexico, LLC
f/k/a DaVita Medical Group New Mexico, LLC
a Delaware limited liability company,
Defendant.

## COURT-ANNEXED ARBITRATION CERTIFICATION

Plaintiff United Urology Centers, LLC ("United"), by and through its counsel of record, Rodey, Dickason, Sloan, Akin & Robb, P.A. (Henry M. Bohnhoff) and pursuant to Second Judicial District Local Rules, Rule LR2-603, certifies as follows:

[ ]   This party seeks only a money judgment and the amount sought does not exceed twenty-five thousand dollars ($25,000.00) exclusive of punitive damages, interest, costs and attorney fees.

[ X ]   This party seeks relief other than a money judgment and/or seeks relief in excess of twenty-five thousand dollars ($25,000.00) exclusive of punitive damages, interest, costs and attorney fees.

3106420.1

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.


By *Electronically Filed /s/ Henry M. Bohnhoff*
    Henry M. Bohnhoff
Post Office Box 1888
Albuquerque, New Mexico 87103
Telephone: (505) 765-5900
Facsimile:  (505) 768-7395
hbohnhoff@rodey.com

*Attorneys for Plaintiff*

2

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT

United Urology Centers, LLC,
a Delaware limited liability company,

      Plaintiff,

vs.                           Case No.  D-202-CV-2020-06590

OptumCare New Mexico, LLC,
f/k/a DaVita Medical Group New Mexico, LLC
a Delaware limited liability company,

      Defendant.

## PLAINTIFF'S FIRST SET OF
## REQUESTS FOR PRODUCTION TO DEFENDANT
## <u>OPTUMCARE NEW MEXICO, LLC</u>

Plaintiff serves this First Set of Requests for Production on Defendant OptumCare New Mexico, LLC, f/k/a DaVita Medical Group New Mexico, LLC ("DaVita") pursuant to New Mexico Rules of Civil Procedure 1-026 and 1-034. You are to produce all documents responsive to these requests that are within your or your attorneys' possession, custody or control. Your written responses to the document requests are to be served, and responsive documents are to be produced, within 45 days of service of the complaint. The documents are to be produced at the law offices of Rodey, Dickason, Sloan, Akin & Robb, P.A., 201 Third Street NW, Suite 2200, Albuquerque, NM 87102.

### DEFINITIONS AND INSTRUCTIONS

1.     "Document" or "record" refers to any original written, recorded or graphic matter whatsoever and all non-identical copies thereof that are within your possession, custody or control (including any document or record to which you have a superior right to compel the production from a third party), including but not limited to papers, books, records, letters, photographs, correspondence, communications, electronic mail, telecopies, telegrams, cables, telex messages, text messages, messages exchanged on instant messaging applications including

3355217.1

but not limited to Discord, Facebook Messenger, Google Hangouts, Kik, Skype, Slack, and Telegram, communications of any kind, including but not limited to comments, replies, direct messages, or private messages, on any social media platforms or applications including but not limited to Facebook, Instagram, LinkedIn, Pinterest, Reddit, Snapchat, Twitter, and YouTube, memoranda, notations, work papers, jottings, agendas, statistical records, desk calendars, appointment books, expense account vouchers, diaries, lists, tabulations, transcripts, minutes, reports, affidavits, statements, summaries, opinions, studies, analyses, evaluations, contracts, agreements, bulletins, notices, announcements, advertisements, instructions, charts, manuals, brochures, publications, newspaper or magazine articles, schedules, price lists, client lists, journals, books or account, records, invoices, statements of account, credit memoranda, records reflecting business operations, sound recordings, recordings by any means of exchange or other conversations, or of interviews or of conferences, or of other meetings, computer printouts, data processing program library, data processing input and output, microfilm, all records kept by electronic, photographic or mechanical means including all records stored on a network or computer hard drive, pleadings, motions, responses to discovery, any notes or drafts relating to any of the foregoing, all things similar to any of the foregoing, however denominated by the parties, and any other documents within the scope of the New Mexico Rules of Civil Procedure.

2.     "Communication" means every manner or means of disclosure, transfer or exchange, and every disclosure, transfer or exchange of information whether orally or by document or whether face-to-face, by exchange, mail, personal delivery, meeting, or otherwise.

3.     The terms "and" and "or" are both used in the inclusive sense, and both require all documents that meet the description of one or more of the disjunctive words or phrases.

4.     The terms "include" or "including" denote a portion of a larger whole and are used without limitation.

5.     The terms "relate," "refer," "reflect," "relating," "referring," or "reflecting" mean constituting or having some bearing on an indicated subject or mentioning the subject, even if only in passing, including but not limited to, any document or communication that constitutes, evidences, contains, embodies, comprises, reflects, identifies, states, refers to, deals with, comments on, responds to, describes, involves or is in any way pertinent to that subject.

6.     Unless the context clearly requires otherwise, any word importing (a) the singular includes the plural, (b) one gender includes the other gender, and (c) the past tense includes the present tense, and vice versa.

7.     If you contend that you are entitled to withhold any requested document on the basis of any privilege or other ground, you are requested to provide a list that (a) describes the nature of the document, (b) states the dates on which the document was created, (c) identifies the person(s) who created and the persons who received the document, (d) describes the specific subject matter of the information, and (e) states the basis upon which you contend you are entitled to withhold the information from discovery.

8.     The discovery requests propounded herein shall be deemed continuing in nature so as to require supplemental answers, pursuant to New Mexico Rule of Civil Procedure 26(e), if you obtain further information or documents between the time you respond and the time of trial.

9.     "You" and "your" refer to DaVita as or to the extent applicable.

10.    "Plaintiff" refers to United Urology.

11.    "Sublease" refers to the Sublease Agreement, effective May 14, 2019, into which you entered for the sublease of the premises located at 1720 Wyoming Blvd. NE, Albuquerque, New Mexico, a copy of which is attached as Exhibit 1 to the Complaint filed in this action.

12.    "Premises" refers to the building and other improvements located at 1720 Wyoming Blvd. NE, Albuquerque, NM.

13.    "June 25, 2019, Nelson Letter" refers to the June 25, 2019, letter from your attorney, Allison Nelson, to "c/o HealthTronics, Inc.," a copy of which is attached as Exhibit 2 to the Complaint filed in this action.

14.    "August 2, 2019, Nelson Letter" refers to the August 2, 2019, letter from your attorney, Allison Nelson, to Henry M. Bohnhoff, a copy of which is attached as Exhibit 3 to the Complaint filed in this action.

15.    "Theft/Vandalism Incident" refers to the "theft and vandalism at the Building" referred in the June 25, 2019, Nelson Letter.

3355217.1

## REQUEST FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**  All documents that reflect your negotiation of and decision to enter into the Sublease.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:**  All documents that reflect your discovery of the Theft/Vandalism Incident.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:**  All documents that memorialize, reflect, or discuss actions you took to take possession of the Premises and the dates of those actions; all documents that reflect your employees' and other agents' or representatives' occupancy of or presence at the Premises between May 14 and 31, 2019; and all documents that reflect any efforts you made to secure the Premises after May 14, 2019, including but not limited to ensuring operation of functioning motion detectors and/or a burglary alarm.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:**  All documents that memorialize, reflect, or discuss any efforts you took to obtain all licenses, permits, and accreditations from all applicable

4

government authorities to be licensed and to operate at the Premises as an ambulatory/outpatient surgical center no later than July 1, 2019

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 5:** All documents that reflect, memorialize, or discuss all actions you took to diligently pursue obtaining all licenses, permits, and accreditations from all applicable government authorities to be licensed and to operate at the Premises as an ambulatory/outpatient surgical center no later than July 1, 2019, including but not limited to all applications you submitted to governmental agencies for such licenses, permits, and accreditations and all responses and other communications received from those agencies.

**RESPONSE:**


**REQUEST FOR PRODUCTION NO. 6:** All documents that reflect, memorialize, or discuss your inability, due to the Theft/Vandalism Incident, to obtain all licenses, permits, and accreditations from all applicable government authorities to be licensed and to operate at the Premises as an ambulatory/outpatient surgical center no later than July 1, 2019.

**RESPONSE:**

3355217.1

**REQUEST FOR PRODUCTION NO. 7**:  All documents that reflect, memorialize, or discuss your efforts to inspect, assess, and repair any damage resulting from the Theft/Vandalism Incident.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 8**:  All documents that memorialize, reflect, or discuss all actions you took before, on or after May 14, 2019, to ensure that the Premises were not vandalized or burglarized.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 9**:  All documents that memorialize, reflect, or discuss any efforts you took to understand, assess, investigate, and/or address the "whole host of additional issues that were completely unrelated to the Theft," as referred to in the August 2, 2019, Nelson Letter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10**:  All documents that memorialize, reflect, or discuss any efforts you took to understand, assess, investigate, and/or address the "numerous issues aside from the Theft, which were entirely outside of the control of Subtenant, [and which]

caused Subtenant to be unable to obtain the Licenses by the contractually agreed upon deadline," as referred to in the August 2, 2019, Nelson Letter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:** All documents that memorialize, reflect, or discuss any efforts you took to understand, assess, investigate, and/or address the "numerous code compliance issues with the Building aside from the damage due to the Theft," as referred to in the August 2, 2019, Nelson Letter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:** All document that memorialize, reflect or discuss the June 3, 2019, visit to "the Property to evaluate what remedial measures were necessary to prepare the Building for licensure and operational status," as referred to in the August 2, 2019, Nelson Letter.

**REQUEST FOR PRODUCTION NO. 13:** All documents that memorialize, reflect or discuss local electrical contractors' and inspectors' June 3, 2019, visit to the Property "to prepare a scope of work and estimates of costs for the electrical repairs and provide an opinion on code compliance, as referred to in the August 2, 2019, Nelson Letter, including but not limited to all reports and other communications received from the local electrical contractors and inspectors,

and records of consideration or discussion of such reports or communications by, between or among DaVita employees or other representatives.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:** All documents that memorialize, reflect, discuss or otherwise address the aforementioned electrical contractors' and inspectors' report(s) that, "notwithstanding the Theft, the existing configuration was not to code and additional work was necessary to comply with local building regulations," and the electrical contractor's estimate that "the electrical work alone would take ***four to six weeks to complete***," as referred to in the August 2, 2019, Nelson Letter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:** All documents that memorialize, reflect, discuss or otherwise address your engagement of "a third party architectural firm and corporate ASC expert to perform a Life Safety and ADA code compliance evaluation," as referred to in the August 2, 2019, Nelson Letter, including but not limited to all communications and other documents reflecting the decision to engage the firm and the expert and all communications with the firm and the expert.

**RESPONSE:**

8

**REQUEST FOR PRODUCTION NO. 16:**   All reports, analyses and other communications received from the aforementioned third party architectural firm and corporate ASC expert, including the analysis that concluded that, "notwithstanding the damage from the Theft, the Building would not pass compliance and required substantial renovations in order to obtain the applicable ASC Licensure," and estimated that the renovations necessary to obtain the ASC Licensure would take ***six to eight months to complete***," as referred to in the August 2, 2019, Nelson Letter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17:**   All communications and other documents that reflect DaVita personnel's consideration or discussion of the reports, analyses and other communications that are described in Request No. 16 above.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 18:**   All communication and other documents that memorialize, discuss or reflect your decision to engage an architectural consultant "to vet the Building with the New Mexico Department of Health," as referred to in the August 2, 2019, Nelson Letter, including but not limited to all communications and other documents reflecting your decision to engage the consultant and all communications with the consultant and/or the New Mexico Department of Health; all documents that memorialize, discuss or reflect the architectural consultant's and the New Mexico Department of Health's vetting, inspection,

9

and/or evaluation of the Building that occurred  following such engagement; and all documents that memorialize, reflect, and/or discuss the New Mexico Department of Health's determination that, "notwithstanding the damage from  the Theft,  the Building required upgrades to current code as part of transferring Subtenant's licenses to the Building," again as referred to in the August 2, 2019, Nelson Letter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 19:**  All communications and other documents that memorialize, reflect and/or discuss your determination that, "regardless of the damage related to the Theft, Subtenant was not able to complete the  renovations necessary to obtain the ASC Licensure by June 25, 2019," as referred to in the August 2, 2019, Nelson Letter.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 20:**  All other communications and documents that memorialize, reflect or discuss your decision to elect early termination of the Sublease.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 21:**   All communications to or from any employee or other representative of Optum or United Healthcare Group (or any of their affiliates) regarding the decision to elect early termination of the Sublease.

10

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 22:** All communications and other documents generated during 2019 that memorialize or reflect consideration, discussion or a decision whether DaVita should or would open an outpatient surgery center in Albuquerque other than at the Premises.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 23:** All communications and other documents that memorialize, reflect or discuss the subject of repairing the damage resulting from the Theft/Vandalism Incident."

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 24:** All communications and other documents that memorialize, reflect or discuss the subject of reimbursing United for the cost of repairing the damage resulting from the Theft/Vandalism Incident, including but not limited to all documents that relate to the July 10 and October 19, 2020, letters from Henry M. Bohnhoff to Allison Nelson.

**RESPONSE:**

11

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By:_____
      Henry M. Bohnhoff
Post Office Box 1888
Albuquerque, New Mexico  87103-1888
Telephone:  (505) 765-5900
hbohnhoff@rodey.com

*Attorneys for Plaintiff*

12

**From:** Hank Bohnhoff [mailto:HBohnhoff@rodey.com]
**Sent:** Tuesday, December 29, 2020 12:31 PM
**To:** james.bombulie@akerman.com
**Cc:** Burris, Eric R.
**Subject:** RE: United Urology Centers, LLC v. OptumCare New Mexico, LLC

I am responding to your December 22 letter.  You should not assume anything if I do not respond to your correspondence.  However, I can advise that United Urology's individual members are residents of Illinois and New York, and its other member is an LLC whose sole shareholder is a Georgia corporation whose principal place of business is Texas.  Given the representations in your letter, it would appear that there is complete diversity of citizenship between the parties to the litigation.



**Henry M. Bohnhoff**
HBohnhoff@rodey.com
505.768.7237

201 Third Street NW, Suite 2200
Albuquerque, New Mexico 87102
fax: 505.768.7395

Rodey, Dickason, Sloan, Akin & Robb, P.A.
www.rodey.com

This message is confidential and may be protected by the attorney-client privilege.  If you believe that it has been sent to you in error, please reply to the sender that you received the message in error and then delete it. Thank you.

*Notice of Removal*
**Exhibit C**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED UROLOGY CENTERS, LLC,
a Delaware limited liability company,

      Plaintiff,

v.

OPTUMCARE NEW MEXICO, LLC f/k/a
DAVITA MEDICAL GROUP NEW MEXICO, LLC,
a Delaware limited liability company,

      Defendant.

Civ. No._____

**DECLARATION OF LISA WILSON RE CITIZENSHIP**
**OF DEFENDANT IN SUPPORT OF NOTICE OF REMOVAL**

I, Lisa Wilson, represent and warrant and after being first duly sworn, depose and say:

1.     My name is Lisa Wilson.  I am over 18 years of age, and I am competent to testify regarding the matters in this affidavit as of my own personal knowledge.

2.     I am the Director of Accounting, New Mexico Region for Optum, Inc., an affiliate of the Defendant OptumCare New Mexico, LLC ("Optum").

3.     Based on a review of legal entity materials regularly maintained by Optum, Inc., which such materials were created and kept in the course of a regularly conducted activity of Optum, Inc.'s business activities,  Optum is a Delaware limited liability company with the following corporate structure:

- OptumCare New Mexico, LLC – sole member: OptumCare Management, LLC
- OptumCare Management, LLC – sole member:  OptumCare Holdings, LLC
- OptumCare Holdings, LLC – sole member: Collaborative Care Holdings, LLC
- Collaborative Care Holdings, LLC – sole member: OptumHealth Holdings, LLC

{M2737612;1}

*Notice of Removal*
**Exhibit D**

- OptumHealth Holdings, LLC – sole member:  Optum, Inc. (State of Incorporation – Delaware / Principal Place of Business – Minnesota)

I declare under penalty of perjury that the foregoing is true and correct.

Lisa Wilson
Director of Accounting, New Mexico Region
Optum, Inc.

22038770.2

JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED UROLOGY CENTERS, LLC, a Delaware limited liability company | OPTUMCARE NEW MEXICO, LLC f/k/a DAVITA MEDICAL GROUP NEW MEXICO, LLC., a Delaware limited liability |

**(b)** County of Residence of First Listed Plaintiff    Williamson County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Henry M. Bohnhoff, Rodey, Dickason, Sloan, Akin & Robb, P.A., P.O. Box 1888, Albuquerque, NM 87103 (505) 765-5900

Attorneys *(If Known)*
Eric R. Burris, Brownstein Hyatt Faber Schreck, LLP 201 Third St. NW, #1800, Albuquerque, NM 87102 (505) 244-0770

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [x] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [x] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability | [ ] 367 Health Care/ | | | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability | [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine | Injury Product | | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product | Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | [ ] 371 Truth in Lending | Act | | [ ] 485 Telephone Consumer |
| [x] 190 Other Contract | Product Liability | [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal | Property Damage | Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury | [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury - | Product Liability | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ | Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer. w/Disabilities - | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| | Other | [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [x] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec. 1332, 1441, 1446

Brief description of cause:
Breach of sublease

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
Excess of $75,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   [ ] Yes   [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
January 5, 2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ Eric R. Burris

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____